## H. W. BENTON and EVA A. BENTON, His Wife, Appellants, v. CITY OF ST. LOUIS.

### Division One, March 31, 1909.

1. **DOWER: Public Street.** A widow has no dower in lands ded-icated to a public street, whether the public use arises by pre-scription, by dedication through a deed or acts *in pais* coupled with acceptance, or by condemnation.

2. **PUBLIC STREET: Improved by Private Citizens: Negligence.** If an avenue from side to side and end to end is a public street, then the mere fact that the people of the neighborhood, or the abutters, or both together, built the sidewalk along its side and from time to time repaired it, without orainance or order from the city's officers, and the further fact that the local drainage was conducted by pipes into a sinkhole in the street by the neighbors and that a manhole was constructed there at private expense, each, or all combined, will not relieve the city from responding in damages to parents whose little son fell into the sinkhole and was drowned as a result of defects in the street or sidewalk laid therein or as the result of a danger-ous condition arising from a combination of said defects and the unguarded sinkhole adjacent to the sidewalk.

3. ——: ——: **Duty of the City.** A city owns and controls its streets as a trustee for the public. It is charged by the law with the primary and bounden duty of keeping them free from nuisances, defects and obstructions caused by itself or by third parties, if it (in the latter instance) had actual or con-

structive notice thereof in time to abate the nuisance, remove the obstruction or repair the defect; and that duty it cannot shirk, or shift over to or halve with others.

4. ————: Lack of Improvements: Liability of City.  `If once the fact of a public highway is established, the absence of sewer or water mains, or a curb-line established, or paving or guttering, has not one whit to do with the city's liability for personal injuries resulting from defects.

5. ————: Dedication: Intention.  Public fences long maintained on either side of the fifty-foot strip; the fact that these fences are practically in line with fences continued through other blocks on either side of the *locus;* the practical abandonment of the whole fifty-foot strip for many years by the abutting owners, and their failure to impress upon the strip the usual earmarks of private use or ownership, like possession, alienation and cultivation; and the fact that such abandonment seems related and responsive to the public need of a street at the point, because of the distance away of parallel streets and the number of people to be accommodated there, all indicate an intention on the part of the abutters to dedicate the fifty-foot strip from side to side as a street for public use.  And while the fact that the entire fifty-foot strip as existing at the time of the trial is an aggregation of various strips of land, which at an early time bore different designations on maps and plats and possibly were released to the public on different dates, may somewhat complicate the situation, yet it can have no adverse bearing on the issue of the dedication of the whole strip.

6. ————: ————: Acceptance.  Mere dedication is not enough to constitute the street a public street in the eyes of the law. There must be an acceptance of the dedication by the public before the dedicated grant becomes a street such as raises the municipal duty to keep it clear of defects, nuisances and obstructions caused by the acts of third parties or by the city itself. But the acceptance may be either express or implied, and if the facts make out an implied acceptance the issue of whether or not the street was a public street should go to the jury.

7. ————: ————: Implied Acceptance: How Shown.  A long public user as of public right; the location and maintenance of street lamps on the dedicated strip; the erection of poles of public service corporations; the barricading of the whole street when out of repair and the employment of the usual city signs on such barricades; the maintenance of street signs at the corner of the street and other acts *in pais;* a roadway proper in the center of the land used primarily for wheeled vehicles and horsemen; a board sidewalk along the edge of the street, constructed of stringers and cross-boards, by the neighbors, and long used, show such a condition as would authorize the jury

to draw the conclusion of acceptance of the dedication of the street to a public use. [Overruling Ruppenthal v. City of St. Louis, 190 Mo. 213.]

8. ————: ————: ————: **Permission of City Officers.** And whether the street lamps and the poles for the public service corporations were placed upon the strip or street by permission of the officers of the city is immaterial, if they had existed there for a long time, for in such case the city must be held to have acquiesced in such public use.

9. ————: **Evidence: Subsequent Repairs: Remoteness.** Where the issue is street or no street, evidence of repairs made by the city after the accident to plaintiffs' child is competent. Where the child was drowned by falling into a sinkhole in May, evidence of repairs made by the city in August or September is competent, and should not be excluded on the ground that the repairs were too remote. Remoteness merely affects the force of the evidence, not its competency.

Appeal from St. Louis City Circuit Court.—*Hon. C. Orrick Bishop,* Judge.

REVERSED AND REMANDED.

*Carter, Collins & Jones* for appellants.

(1) Evidence tending to show a large population residing in the locality in question and making use of this street was admissible. Ely v. St. Louis, 181 Mo. 729. (2) Evidence showing that the city had done work upon this street at this particular point was admissible. Dinsmore v. St. Louis, 192 Mo. 265. (3) To establish the character of the locality, where the injury occurred, as part of a public street, nothing more was essential than to show that it was in actual possession of the city, and open to, and used by, the public as a thoroughfare at the time. It was not necessary to prove any formal dedication or appropriation of the street. Maus v. Springfield, 101 Mo. 617. (4) The evidence which was offered to show that the city did work on this street at the place in question

after the accident occurred, although there might have been no evidence to show that it had in any way assumed jurisdiction over this street prior to the accident, was admissible for the purpose of showing that the defect complained of was one which the city was bound to repair. Brennan v. St. Louis, 92 Mo. 488. (5) The fact that the city authorized the erection of poles upon this so-called ten-foot strip justified a finding that this ten-foot strip constituted part of the public street over which the city had exercised jurisdiction. Johnson v. St. Joseph, 96 Mo. App. 669. (6) The existence of a highway by prescription is generally proved by the parol evidence of witnesses that the road or street in question has been known and used as a highway common to all the people for the necessary period of prescription. Commonwealth v. Coupe, 128 Mass. 63. (7) In Missouri the period of prescription is ten years. Downend v. Kansas City, 156 Mo. 74. (8) Use of the street embracing the ten-foot strip by the public for ten years as a street and the doing of some act by the city inviting or sanctioning its use as a street by the public, imposes upon the city the duty of maintaining the same in reasonable repair for such use. Maus v. Springfield, 101 Mo. 613; Baldwin v. Springfield, 141 Mo. 212. (9) Before the trial court was justified in sustaining the demurrer to the testimony, it must appear that, admitting all the evidence introduced by plaintiffs to be true, and giving them every reasonable inference to be deduced therefrom, the public had not used the street embracing the ten-foot strip as a thoroughfare for more than ten years prior to the death of appellants' child and that the city had done no act inviting or sanctioning its use as a street by the public.

*Charles W. Bates* and *Charles P. Williams* for respondent.

(1) The city had a discretion to maintain a roadway only. Ruppenthal v. City, 190 Mo. 213; Bassett v. St. Joseph, 53 Mo. 303; Heckler v. St. Louis, 13 Mo. App. 277. (2) This street was not dedicated or established according to the provisions of the charter. Charter of St. Louis, art. 6, sec. 15. (3) Point 3 in appellants' brief is answered by the case of Ruppenthal v. St. Louis, supra. (4) There is nothing in the proposition of subsequent repair. (5) It does not appear that any officer who had power to bind the city authorized the erection of the poles spoken of in the evidence. (6) There is no evidence with respect to the lights that binds the city. (7) There is no evidence that the city ever undertook to maintain or repair this sidewalk, or to improve that portion of the street for purposes of public passage. (8) The main proposition in this case, and the main contention of the city, is that in the exercise of its reasonable discretion it had a right to maintain in this remote section of the city a roadway only. Under this contention, if it be sound, as we believe it is, it makes no difference whether or not the ten-foot strip standing in the name of George W. Campbell, where the accident in question in this case occurred, was within the technical limits of the public street. Ruppenthal v. City, 190 Mo. 213; Bassett v. St. Joseph, 43 Mo. 303; Heckler v. St. Louis, 13 Mo. 277.

LAMM, P. J.—Plaintiffs, father and mother of George Benton, an infant between six and seven years, sue for the wrongful death of George, drowned May 4, 1905, at a place in defendant city known as "Bruno avenue," laying their damages at $5,000. At the close of their evidence, defendant asks an instruction in the nature of a demurrer. The trial judge signifies his

intention to give it. Thereupon plaintiffs request permission to take a nonsuit with leave. Permission going, they take a nonsuit. In due time they move to set it aside, and (their motion denied) they appeal.

The petition charges that Bruno avenue is a public street of defendant; that a duty lay upon defendant to keep it in safe condition; that at a certain point in said avenue there was for a long time a "sink hole, surrounded with a large excavation, ditch or hole" about five feet deep and twelve feet in diameter and coming up flush with the edge of the north sidewalk on said avenue; that there was no rail on the sidewalk at the point and the boards of the walk were loose and insecure; that such dangerous and defective conditions were well known to defendant or could have become known to it by the exercise of ordinary care in time to have made repairs before the death of George, but that it failed and neglected to put the street and sidewalk in safe condition and that such negligence caused George's death. That in walking upon the sidewalk in said street at said point in the afternoon of May 4, 1905, he stepped or fell from the sidewalk into said excavation and was drowned—the excavation being then filled with water up even with the surface of the sidewalk and water in said street.

The answer was a general denial.

There is (among minor questions raised) a main proposition in the case in a sharp issue on the question of fact of a street or no street at the *locus*.

Facts vital to the disposition of material questions made on appeal will appear in connection with their determination.

I.   If the sidewalk was on a public street there can be no doubt but what the charge of negligence was well made out and that such negligence was the proximate cause of the death of George. It was an

old, narrow, wooden sidewalk, the worse for wear and
decay, built of boards nailed crosswise on stringers
and, at the point in hand, rested elevated on wooden
posts several feet high. The boards were loose, the side-
walk tipped south towards a hole running under it and
thence out in the street. This hole was a large and
deep affair. The combination of hole, tipped side-
walk and loose boards shown by the evidence presents
an inflamed case of a negligently maintained and dan-
gerous pitfall to adult or child. Not only so, but for
a long time, in not unusual rains, the hole filled with
water gathered by surface gutters and drainage, and
this water arose even with the walk. There had been
a heavy but not unusual rainfall on May 4th. The
water gathered in the hole caused the sidewalk to
float, that is, it (as a whole) seemed not fastened and
anchored down securely. George was of such tender
age that contributory negligence could not be imputed
to him as a matter of law. In fact there is no plea
of contributory negligence and none that his parents
were guilty of negligence in allowing him to be on the
street at the time. It seems they had but moved into
the neighborhood and knew nothing of the bad side-
walk or of the hole or of storm water usually accumu-
lating there, nor did the child. A little bit before he
was drowned, George had been seen busying himself
placing planks, some distance away up street, for foot-
men to cross Bruno avenue dryshod. He had on rubber
boots and a striped cap. He was next seen making
his way on the sidewalk towards this hole—this, a
very few minutes before the alarm was given. No
human eye saw him drown. But a neighbor woman
saw him going toward the spot immediately before.
She had but turned to her household duties and, hear-
ing a cry (a death cry, obviously) hurried out doors.
On investigation, his cap was seen floating on the hole
of water and his body was presently fished out by
hooking a pole into one of his rubber boots. Some

witnesses describe the sidewalk as "wobbly" and
"rickety" right close where his body lay. In this con-
dition of proof the jury could reasonably infer that
the defects in the sidewalk hard by the treacherous
pool caused him to slip or step off and drown. There
was proof, too, that these defects were of long stand-
ing, so that the city could not claim it had neither
actual nor constructive notice in time to remedy them.
Hence the demurrer cannot be upheld on the theory
that plaintiffs made no case on the facts, if it be once
further determined that the issue of fact of street or
no street at the *locus* should have been put to the
jury.

II. Plaintiff's theory of the case is that the side-
walk is on a public street; *contra,* defendant insists it
was on private ground and, hence, the city owed no
duty to keep it safe. Such controversy (assuming
facts already stated) seeks additional facts, *viz.*:

Bruno avenue runs east and west in the west
part of the city. McCausland avenue, a public street,
crosses it (with a slight jog) east of the *locus.* Blendon
Place, another street, comes into it from the north
a little ways west of the *locus.* With a jog, Blendon
Place then runs on south. At an early date, not dis-
closed, the land in that region seems to have been
platted into blocks of irregular dimensions, and ways
were left open between them. At a time, not disclosed
by the evidence, but many years ago, a street was dedi-
cated by deed and called Bruno avenue. The
whole region was then an outlying country dis-
trict apparently. Bruno avenue, as dedicated
by deed, was thirty feet wide. Ten feet off
the south side of this deeded street were, many
years ago, inclosed by the abutting proprietors by a
permanent fence, as a part of their grounds and this
fence has ever since been maintained to the exclusion
of the public. A city plat or survey shows that a

strip of ground twenty feet wide lying north of and
adjacent to the thirty-foot street, so dedicated, is
marked as a ''private road.''   When this plat was
made is dark, but the paper private road antedates
the oral evidence in the case which, in turn, covers a
period of fifteen or twenty years next before the trial.
Hard by and north of the private road is a strip of
ground ten feet wide marked on the same city map or
plat with the name ''George W. Campbell.''   In point
of fact, however, these three strips so severally desig-
nated on paper as ''private road,'' as ''Bruno avenue''
and as ''George W. Campbell'' (barring said ten feet
on the south taken in to a private inclosure), make
on the earth's surface a strip of ground fifty feet wide
inclosed for fifteen or twenty years on the north and
south by such permanent fences as commonly ear-
mark a public road, and the whole strip is known
in the neighborhood as Bruno avenue.- The record
is dark as to whether the said ten feet on the south
were vacated by legal steps.   It is dark as to whether
the original Bruno avenue was ever widened by legal
steps on the north by taking in the private road and
the Campbell strip.   The next parallel streets, north
and south of Bruno, are, severally, say, six hundred
feet away.   The distance from McCausland avenue to
Blendon Place is, say, six hundred feet, but (while
the abstract is not clear) it is not our understanding
that Bruno avenue ends at McCausland on the east
and Blendon Place on the west.   It crosses said streets
and runs on.   On the north side of Bruno at the *locus*
are a church, some residences, and some inclosed
grounds.   On the south side of said 600-foot section
of Bruno is probably a residence and some lots used
for gardening.   On the south side of Bruno there
never was a sidewalk.   On the north side there has
been for fifteen or twenty years a straight sidewalk,
one section of it laid in cinders and another with boards
and stringers.   This sidewalk, as we grasp it, is on a

straight line with that on the north side of Bruno east of McCausland. From photographs presented here we infer that the neighborhood north of Bruno is quite thickly settled. There is no testimony showing that the sidewalk in question was built by the city or by its order. There is testimony to the contrary, to the effect that when originally put down, as said, fifteen years or more ago, it was voluntarily laid by the abutting property-owners or by the neighborhood and wholly on the Campbell strip of ten feet. There is no testimony that the sidewalk itself was ever repaired by the city or by its order. To the contrary there is evidence that some repairs were voluntarily put on by neighborhood subscription and individual effort. There is no testimony that any curb line was ever established on Bruno or that the city sewer or water system is extended along the street. In the center of the fifty-foot strip is a roadway for vehicles, twenty or thirty feet wide. This roadway the city practically admits is a public street. It is partly on the old private road and partly on Bruno avenue as originally dedicated by deed. The city has graded it, repaired it, and claims it as a street; whether by condemnation, by prescription or by dedication and acceptance is not shown, nor is it material. On Bruno avenue, a little ways from Blendon Place, is a hole called a sink-hole. The neighbors once used it for drainage purposes and probably do so now. Into this sink-hole drain pipes run, crossing under the sidewalk. A manhole was there constructed long ago by private enterprise to serve some purpose of rustic and rural drainage. At spells the water, eating into the roadway from the sinkhole, enlarged the hole and from time to time city teams and employees hauled in filling and repaired the roadway at the hole and elsewhere. The record shows that weeds and some small bushes were at times allowed to grow about this hole. At times a temporary barricade of some sort protected

travelers in vehicles on the roadway from getting into the hole and photographs presented to us show that the travelling public are somewhat protected and warned by a rude stone curbing running south of the hole and next to the roadway for a short distance, and further that there is a rude gutter made of flagging leading from the hole a little ways and draining it off on the side of the street. At times covered by the oral evidence, the hole was of such dimensions that the traveled way referred to bended from the center of the fifty-foot strip to the south and returned to its central course when the hole was passed. At the corners of McCausland and Bruno and Blendon Place and Bruno the usual city signs are put up on posts, naming the streets crossing there, and indicating the fifty-foot strip as "Bruno avenue." These signs have been there for many years. At intervals Bruno avenue was temporarily closed by barricades for repairs and on these was the usual sign used in the city indicating that the street was, for the nonce, put out of use because of its bad condition. On Bruno avenue close to the *locus* is a street lamp, maintained by the city for years, just at the south edge of the sidewalk and on the ten-foot Campbell strip. One or more lamps of a similar nature are maintained on the same strip by the city between McCausland and Blendon Place. It seems from the evidence that there fell a time in the history of St. Louis (mysteriously and by way of metaphor) referred to as the "moon yet" period. Before that period, electricity was used to light the ways of that town in the suburbs. During the electricity, as over against the "moon yet," period, the city maintained an arc light at the corner of Blendon Place and Bruno, and we infer that poles sustaining the wires were on the ten-foot strip. On this same strip, under permits granted by the city, are telephone and lighting poles erected by public service corporations.

It seems that many years ago George W. Camp-

bell owned quite a tract of land in that region; that he is dead, but when he died is not shown; that he left a widow—whether she is dead or alive is not shown; and it appears that long ago he parted with all his holdings, barring, may be, the ten-foot strip on which the sidewalk is laid. One of the minor contentions of the city is that dower in the widow of George W. Campbell would seem to be outstanding and that this fact interferes with a prescriptive right of way in the city or public or with a right of way arising from dedication.

There was testimony tending to show that the fence long maintained along the north side of the sidewalk as a visible boundary of Bruno, was in line with the north line of Bruno as continued east of Mc-Causland. We infer that this extension was also known as Bruno avenue and that it ran east with a uniform width of fifty feet. There was testimony that the sidewalk in question had long been used by pedestrians in that neighborhood. That many people passed to and fro over it daily for many years and that there was nothing during all that time to indicate to any one coming afoot on Bruno avenue from McCausland or Blendon Place that the walk was not a public walk for footmen as part of the street.

The foregoing is sufficient of the record to pass upon the issue of law raised by the demurrer as to whether the sidewalk, or, what amounts to the same thing, the ten-foot Campbell strip, was part of a public street.

On that record, we observe:

(a) The suggestion that dower is outstanding in the widow of George W. Campbell in the ten-foot strip deals only with the surface of things. The case really turns on another question, viz.: Is that strip a component part of a public street? If it be, then, under the reasoning of Venable v. Railroad, 112 Mo. 103, and Chouteau v. Railroad, 122 Mo. 375, we must

hold that such widow has no dower in a public way. [Chrisman v. Linderman, 202 Mo. 1. c. 615; Baker v. Railroad, 122 Mo. 396.]

In the Venable case it was decided that a widow had no dower in a strip conveyed by her husband during coverture to a railroad company for a right of way.

In Chouteau v. Railroad, it was held, in effect, that a widow was not endowable in land dedicated to public use as a railroad right of way. The argument runs on the theory that the land was subject to the sovereign right of eminent domain, that a widow was not endowed of land condemned for public use under statutes regulating the exercise of eminent domain; therefore, if the land was subjected to public use by a conveyance, instead of by condemnation under the exercise of the right of eminent domain, the same result follows.

The proposition that a widow is not endowed in land impressed with an easement for public use accords with the general law.

In 14 Cyc. 930, the doctrine is announced as follows:

"Where land is dedicated by the owner to a public use, as for a street, highway or market-place, such dedication divests the wife's right of dower. And where a *quasi*-public corporation, such as a railroad company, having authority to acquire lands for a public use and hold the same in fee, takes lands by grant from the owner for a right of way or other public purpose, the wife's right of dower is effectually barred."

As to dower, we can conceive of no difference in principle whether the public use arises by prescription, by dedication through a deed or acts *in pais* coupled with acceptance, or by condemnation. In each instance the husband during his lifetime held the fee and, the

fee in each instance passing to the public for its use, the inchoate right of dower is extinguished.

We pass from the question of dower outstanding in Campbell's widow, deeming it of no significance on the merits.

(b) If Bruno avenue from side to side and end to end is a public street, then the mere fact that the people of the neighborhood, or the abutters, or both together, built the sidewalk originally along its north side and from time to time repaired it without ordinance of the city or order from its officers and the further fact that the local drainage was conducted by pipes into the sink-hole by the neighbors and that a manhole was constructed there at private expense, each, or all combinéd, cannot relieve defendant city from liability for defects in its street or a sidewalk laid thereon, or from a dangerous condition arising from a combination of said defects and the unguarded sink-hole adjacent to the sidewalk. [Wiggin v. St. Louis, 135 Mo. 558.]

This, because:

A city owns and controls its streets as a trustee for the public. It, therefore, stands charged by the law with the primary and bounden duty of keeping them free from nuisances, defects and obstructions caused by itself or by *third* parties if it (in the latter instance) had actual or constructive notice thereof in time to abate the nuisance, remove the obstruction or repair the defect. It cannot shirk that duty, or shift it over to, or halve it with, others. So much is clear law in Missouri. [Welsh v. St. Louis, 73 Mo. 71; Oliver v. City of Kansas, 69 Mo. l. c. 83; Carrington v. St. Louis, 89 Mo. 208; Russell v. Columbia, 74 Mo. 480; Beaudean v. Cape Girardeau, 71 Mo. l. c. 395, *et seq.,* and cases cited; Streeter v. Breckenridge, 23 Mo. App. l. c. 250; Hill v. Sedalia, 64 Mo. App. l. c. 501, *et seq.*]

(c)   The case is put to us by respondent's learned counsel somewhat as if the absence of sewer or water mains, or a curb line established, or paving, guttering, etc., had something to do with the city's liability. Such *indicia* of a highly finished street in a great city may conclusively show acceptance of a dedication of the ground for street purposes, but they have not a whit to do with liability for defects, if once the fact of the existence of a public highway is determined. Otherwise we would have to write the law this way for the little and that way for the big, one way for villages with no paved streets, no water or sewer mains and no curb line established, and another way for cities where such things exist.   A city like the humble village or country town may leave its streets as dirt roads, and yet be liable for defects negligently allowed to exist in them.   [Warren v. Independence, 153 Mo. l. c. 599; Dinsmore v. St. Louis, 192 Mo. 255; Conner v. Nevada, 188 Mo. 148; Meiners v. St. Louis, 130 Mo. 274.]

(d)   With the foregoing subsidiary questions put at rest, we face the main proposition of the case, *viz.*: was Bruno avenue, at the *locus,* a public street 'fifty feet wide?   In considering that question it may be assumed that the street was not condemned for public use by legal proceedings.   So, while a question of the existence of a street by prescription is in the case, yet it would be unprofitable to consider it, because the question of dedication seems uppermost and controlling.

Speaking to that question in the light of the facts, there ought to be no doubt that the *animus dedicandi* existed; that is, that the abutters intended to dedicate the street for public use from side to side fifty feet wide.   This conclusion, we think, reasonably follows from facts established by proof.   For example, permanent fences, long maintained on either side, earmark a public street.   Again, the fact that these fences

are practically in line with the north and south fences of the continuation of Bruno avenue adds strength to that idea.

In the next place, the practical abandonment of the whole fifty-foot strip for many years by the abutting property-owners and their failure to impress upon the strip the usual earmarks of private use and ownership, like possession, alienation, cultivation, etc., lend force to the conclusion by leading up to it. Especially so when such abandonment seems related and responsive to the public need of a street at that point because of the distance away of parallel streets and the number of people to be accommodated by a thoroughfare there.

That Bruno avenue as now existing is an aggregation of various strips of land, which smaller strips at an early time bore different designations on maps and plats and possibly were turned out to the public on different dates, somewhat complicate the matter, but can have no adverse bearing on the issue of the dedication of the whole strip; for if each component part was dedicated, then the blanket of dedication covers the whole.

But mere dedication is not enough to constitute the street a public street in the eye of the law. There must be an acceptance of the dedication by the public before the dedicated grant becomes a street such as raises the municipal duty to keep it clear of defects, nuisances and obstructions caused by the acts of third parties or by the city itself.

It seems clear law that where a street is a mere paper one, as distinguished from a street in fact, then the common sense of it is that a municipality is not charged with the duty of clearing it of obstructions and dangerous defects resulting from the laws of nature or the acts of man. Here we need not bother with the refinements of the law in that behalf because this case is not such a case.

So, there is conflict of doctrine as to whether a city must put its traveled streets from side to side and from end to end in condition for reasonable safety for travel by night as well as by day. It is maintained on one hand and denied on the other that a city can leave portions of its *de facto* streets in a "state of nature," without liability for damage from defects. We need not enter into that inviting field of speculation and canvass the authorities pro and con on the proposition, because this case is not such case. The student in jurisprudence may find phases of that question considered in the Ely case, 181 Mo. 723; in the Tritz case, 84 Mo. 632; in Goins v. Moberly, 127 Mo. 116; in Walker v. City of Kansas, 99 Mo. 647; in Roe v. City of Kansas, 100 Mo. 190, where the doctrine of the Tritz case is repudiated; in Baldwin v. Springfield, 141 Mo. 205; in Meiners v. St. Louis, 130 Mo. 274; in Johnson v. St. Joseph, 96 Mo. App. 663; in Brown v. Glasgow, 57 Mo. 156, and in many other cases.

Attending now to the fact of acceptance of the dedication, we think it clear that a case was made for the jury. An acceptance of a dedicated street may be either express or implied. It may be conceded to respondent that no express acceptance is shown, but we think an implied one was made out.

Judge Elliott, in his excellent work on Roads and Streets (2 Ed.), says: "An implied acceptance arises in cases where the public authorities have done acts recognizing the existence of the highway, and treating it as one of the public ways of the locality. Where control of a way is assumed by the authorities representing the public corporation, an acceptance will be implied. . . . One of the principal indications of acceptance is that of improving or repairing the road or street. In one case it was held that digging a public well in the way was evidence of acceptance, and we have no doubt of the soundness of this decis-

ion; for no matter what the particular act is, if it be one which could only be rightfully done upon a highway, it should be regarded as evidence of acceptance." [Elliott on Roads and Streets (2 Ed.), secs. 152-3.]

Continuing, that author says (*ibid.,* sec. 154): "There has been much diversity of opinion as to whether user by the public will amount to an implied acceptance and cast the burden of maintenance upon the local government. Professor Greenleaf says: 'It does not follow, however, that because there is a dedication of a public way by the owner of the soil, and the public use it, the town, or county, or parish, is bound to repair. To bind the corporate body to this extent, it is said that there must be some evidence of acquiescence or adoption by the corporation itself, such as having actually repaired it, or erected lights or guide-posts thereon, or having assigned it to the surveyor of highways for his supervision or the like.' This statement, it is noticeable, is a very careful and guarded one, and is indicative of the doubt in the mind of the writer. In another treatise (Angell, Highways, sec. 159) appears language more clearly exhibiting the uncertain state of the law. This uncertainty is removed by the later authorities, and it may now be considered as the prevailing opinion that an acceptance may be implied from a general and long-continued use by the public as of right. The later decisions upon this subject will, when analyzed, be found to be well bedded in principle. The 'town, county, or parish,' using Professor Greenleaf's terms, is represented by the town, county or parish officers, but the officers are not the corporation. The municipal corporation consists of the inhabitants and not the officers; the officers are, in truth, nothing more than the agents of the corporation. The inhabitants, therefore, stand to the officers as principals, and if the principals have, by their conduct, accepted the dedication, it is of no great

importance that the agents have taken no action in the matter. The inhabitants of a locality having by long-continued use treated the way as a public one, they make it such without the intervention of those who derive their authority from them. Creating towns, cities, and other public corporations, is 'but the investing the people of the locality with the government thereof,' and they may themselves exercise the powers of government of highways quite as effectually by continued use as by any other method. Of course, user cannot constitute a way a public one in cases where the incorporating act requires an acceptance by some officer or body expressly designated.''

We have liberally borrowed from Judge Elliott's text because he well formulates the general law under this head and the doctrine announced agrees with the general trend of the decisions of this court and other appellate tribunals in this State. It is needless to lengthen this opinion by excerpts from opinions in those cases. Citing a few of them will do, *viz.*: Meiners v. St. Louis, 130 Mo. 274; Baldwin v. Springfield, 141 Mo. 205; Hunter v. Weston, 111 Mo. 176; Maus v. Springfield, 101 Mo. 613; Beaudean v. Cape Girardeau, 71 Mo. 392; Rose v. St. Charles, 49 Mo. 509; Becker v. St. Charles, 37 Mo. 13; Heitz v. St. Louis, 110 Mo. 618; Golden v. Clinton, 54 Mo. App. 100; Garnett v. Slater, 56 Mo. App. 207; Hill v. Sedalia, 64 Mo. App. 494; Johnson v. St. Joseph, 96 Mo. App. 663.

In determining the fact of acceptance of a dedication for street purposes it must be borne steadily in mind that the roadway proper primarily is for wheeled vehicles and horesmen, whereas the sidewalk is that portion of the street intended for the use of footmen and which they are invited to use under the due guards of the law. In this case the long public user as of public right, the location and maintenance of street

lamps on the Campbell strip and the poles of public service corporations, the barricading of the whole street when out of repair and the employment of the usual city signs on such barricade, the maintenance of street signs at the corner of the street and other acts *in pais,* show such condition of things as would permit the jury to draw the conclusion of acceptance. The fact that there was no sidewalk or other provision for footmen except the sidewalk in question occupy- ing the usual place of a sidewalk, and the further fact that there was nothing to indicate to a passerby that the sidewalk was not for public use or on public ground, coupled with other facts shown, tend to estop the city from denying its acceptance of the Campbell strip as part of the street. Such facts amount to an invita- tion held out to the public to use the sidewalk as of public right.

Some confusion exists in the record as to whether the proper officers in charge of the proper depart- ments of city government permitted the use of the Campbell strip for street lamps and the poles for public service corporations. If these poles and lamps had been erected but a short time it might be proper to go into these questions on this appeal. But they existed there for a long time and whether put there in strict accordance with the red tape and minutiae of detail of city charter regulations, or not, the city must be held to have acquiesced in such public use of the strip.

We are cited by learned counsel for respondent to the Ruppenthal case (190 Mo. 213), as direct authority in favor of sustaining the demurrer. Because of the strong reliance put on that case, we have re-examined it with anxious care. The Ruppenthal case is some- what grounded on the Ely case (181 Mo. 723), but the law in the Ely case must be read in the light of the facts of that case, and those facts do not accord with the facts in the Ruppenthal case.

In the Ely case there was a roadway graded down on the western side of an eighty-foot street. There was an ordinance requiring the street to be partially graded. When this was done, it was cut down so that the eastern side of the street was elevated several feet above the graded wagon road and "left as nature had made it." There never was any sidewalk on the street and nothing to designate a way for footmen except a footworn path made by pedestrians on this elevated portion of the street on the eastern side. Weeds grew on both sides of this path and storm water washed a gully across it. Into that gully Ely fell on a dark night. The question in the case was whether it was the city's duty to make a sidewalk or, failing to make one, was it responsible for the condition of the path. The conclusion reached was adverse to the plaintiff. [See in this connection Conner v. Nevada, 188 Mo. 148, written by the same learned brother.]

In the Ruppenthal case the facts were these: There was a granitoid sidewalk laid by abutting property-owners on a public street. This sidewalk had been there for a long time (eight years the syllabus says) and it was not constructed by order of the city. At the end of the granitoid walk there was a drain pipe put in by some abutting property-owner long before, which pipe did not extend for the width of the sidewalk by eighteen inches at either end. Commencing from that pipe, and continuing in line with the granitoid, there was what is denominated a dirt pathway as wide as the pipe was long, i. e., three feet narrower that the granitoid walk. This pathway was used by pedestrians who came on the street and traveled the granitoid walk to its end. The storm water, rushing through this pipe, cut away the dirt at the end of this walk next to the granitoid and made a dangerous hole there. Plaintiff, in the nighttime, passed along this granitoid walk. He had lived in the neighborhood

for seven years but knew nothing of this hole and, reaching the end of the walk, fell into the hole and was hurt. The street dealt with in the Ruppenthal case was eighty feet in width—the macadamized roadway fifty. Outside of the macadamized part, the street had not been graded and the city seems to have elected to pay no attention to it. Weeds grew on the unimproved sides and the roadway was higher than those sides. Along those unimproved sides were natural water drains. Based on the theory that the city had not taken possession of the fifteen-foot strip on each side of the macadamized roadway for the purposes of a street and had done nothing to improve it, but had left it in "a state of nature," we held, first, that the city was not liable as a matter of law for the dangerous hole made by the flowing of water through the drain pipe where the dirt pathway connected with the granitoid, and, second, that plaintiff was guilty of such contributory negligence as defeated recovery.

I agreed to that opinion when handed down, but am now satisfied it is out of line with general principles of law declared over and over again by this court. My conclusion by way of amends is that my agreeing to that case can be best told in the dispatch sent his government by Sir Charles Napier (was it not?) when in India. Having been forbidden to take Sind, he took it and announced his action in one word: "*Peccavi.*" I am sorry I agreed to it. There was no "state of nature" in the Ruppenthal case. There was a public street and the city had allowed the works of man to change the works of nature by marring the street and making it dangerous where foot travel was invited. The existence of that granitoid walk on a public street was an unmistakable invitation to foot-travelers to use it. The existence of that pitfall at the end of that granitoid walk in the line of travel, ostensibly provided for footmen, was a defect in a public street and the city, barring Ruppenthal's con-

tributory negligence, was liable in damages for injuries received at that pitfall.

We will not follow the Ruppenthal case but will overrule it except its holding on the question of contributory negligence.

We conclude it was error to give the instruction in the nature of a demurrer.

III.   As the case must go back for another trial it is well to pass on a ruling on evidence.   There being an issue of street or no street, subsequent repairs made by the city are competent as tending to show that the city recognized the *locus* as a public street.   [Brennan v. St. Louis, 92 Mo. l. c. 488, and cases cited; Bailey v. Kansas City, 189 Mo. l. c. 510; City of Jeffersonville v. McHenry, 22 Ind. App. l. c. 12; Elliott on Roads and Streets (2 Ed.), sec. 865.]

Having put in some evidence of prior repairs, plaintiff tendered evidence of subsequent repairs made in the August or September, after George was drowned in May.   The court excluded the evidence and committed error in doing so.

The only justification offered for this ruling is that the repairs were too remote, but the remoteness merely affects the force of the evidence, not its competency.   It was not so remote that it could be said as a matter of law to have no bearing at all.

Other rulings on the exclusion of testimony are either sufficiently covered by the opinion on the main propositions, or will not likely arise on a rehearing and may therefore be put aside.

The judgment is reversed and the cause is remanded to be proceeded with in accordance with this opinion.

All concur.