EFFIE SHAW, RESPONDENT, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, APPELLANT.*

In the Springfield Court of Appeals. Opinion filed September 28, 1928.

*Corpus Juris-Cyc References: Dedication, 18CJ, section 33, p. 52, n. 41; section 67, p. 72, n. 79; section 80, p. 82, n. 85; section 107, p. 96, n. 35; section 115, p. 101, n. 12; section 116, p. 101, n. 15; Municipal Corporations, 43CJ, section 1867, p. 1104, n. 30; Railroads, 33Cyc, p. 930, n. 88.

*E. T. Miller, Henry S. Conrad, L. E. Durham, Hale Houts* and *Ilus M. Lee* for appellant.

*Hamlin & Hamlin, Herman Pufahl* and *C. W. Hamlin* for respondent.

BAILEY, J.—Plaintiff sued defendant railroad company for damages on account of personal injuries suffered by her caused by a fall on a footway underpass in the' city of Springfield. Plaintiff obtained a verdict and judgment in the sum of $2750 and defendant has appealed.

The first alleged error to be considered is the refusal of the court to direct a verdict for defendant requested at the close of all the evidence. The facts are substantially as follows: Washington avenue is a public street in the city of Springfield, running north and south. It is intersected by yard tracks of defendant railroad running east and west. South of these tracks, at a distance of about 200 feet, Washington avenue is intersected by Commercial street also running east and west. Some distance north of the tracks is Chase street likewise running east and west across Washington avenue. It seems that when Washington avenue was originally laid out and platted, it ended on either side of defendant's right-of-way between Com-

mercial and Chase streets and at that point was on a high fill or embankment. However, the street had, in former times, been built up and used for travel across defendant's right-of-way for some forty or fifty years. In the year 1901 the city of Springfield, at its own expense, built a subway on Washington avenue under said tracks consisting of two roadways, each 13.7 feet in width, separated by piers in the center, the east roadway being for northbound traffic and the west for southbound traffic. At the time of the accident, and for many years prior thereto, Washington avenue was paved and curbed and was an important trafficway in North Springfield. 'As originally platted, Washington avenue was 82½ feet in width from property line to property line. However, from Commercial street north, and from Chase street south, to defendant's right-of-way, the street had been narrowed to a width of thirty feet from curb to curb and the curb lines were in line with the wall on either side of and supporting the subway. At the time this subway was constructed a walk for pedestrians was built on the west side of the west roadway, the surface of which, was a little above the surface of the roadway. This walkway, by turning slightly to the west at either end, was connected with the sidewalk on the west side of Washington avenue and was built and evidently maintained by the city until a new foot subway was constructed in 1926. The evidence shows this new subway was constructed by the railroad company to enable the city of Springfield to remove the sidewalk on the west side of the vehicular subway and relieve, to some extent, traffic congestion. The sidewalk on the west side of Washington avenue, on either side of defendant's right-of-way, was made to turn or jog to the west, in order to connect with the new foot underpass constructed by defendant just west of the vehicular subway, and was separated from it by a wall some two feet in thickness. This new underpass for pedestrians, in which the accident complained of occurred, was built of concrete, sides, top and bottom, and was a little wider than the sidewalk on the west side of Washington avenue and about 120 feet in length. The evidence showed that Washington avenue sloped from both sides toward this underpass so that in rainy weather dirt and water would collect therein and, since there was no drain, the floor of the underpass would become muddy and slick. At the time the underpass for pedestrians was constructed the city of Springfield had caused conduits for lights to be laid in the walls and, at the time of the accident, was maintaining electric lights therein. It also seems that none of the city's north and south streets in that vicinity were platted so as to indicate they crossed defendant's tracks and that the subway on Washington avenue was the only means of crossing defendant's right-of-way by vehicles for several blocks on either

side thereof. There was an overhead crossing for pedestrians about two blocks west of Washington avenue.

Plaintiff lived north of the tracks on Benton avenue and it was her usual custom to walk through this underpass in going from her home, although she had no certain recollection as to the walkway in the vehicular subway in use prior to the construction of the foot subway, but may have used it. On the 9th day of December, 1926, plaintiff, accompanied by her three children, passed through the foot subway. At about 5:30 P. M. on that date, while returning home through the foot underpass, she slipped and fell. She testified that "there was mud and water, 'a little bit of all kinds of debris, papers and things' in the foot subway; that the mud was wet and there was water. That water could run into the subway from the south side or could seep through the walls; that during wet weather one could see it seeping through the walls; that there was no drain in the subway at the time she fell; that the slush, mud and debris she 'mentions' was 'an inch deep anyhow, maybe more.' That in the fall, she got her clothes 'in a terrible condition.' That she fell about 5:30 in the afternoon; that it was getting dark at the time; that there were lights in the subway, but that they were not very bright. That at the time she fell, her two smaller children were ahead of her, and the older daughter behind; she did not think about falling, but she tried to 'go through carefully to keep from splashing the mud on my clothing.' That as she was walking through, it seemed her feet 'just slipped in the mud or slush' and she fell backwards, striking the pavement with her right hip and spine; it was a hard fall; she did not get up; she could hardly move; she told one of the children to stay with her, and the other to run and telephone her father."

The question of user and dedication of the foot underpass is an important one in this case and we think the evidence in regard thereto should be fully set out. The record does not show any formal opening of the underpass to the public. It does tend to show that the purpose for which it was constructed was a public one.

Plaintiff testified that "the subway in which she fell was within a block or two of her home; she traveled through it many times—perhaps every two or three weeks; that she usually walked; sometimes she went over the viaduct on Jefferson street in crossing the tracks." W. W. McMasters, a witness for plaintiff, testified that the foot subway had been built in 1926, about a year before the trial, and that during December, 1926, he went through the subway "two or three times a day."

W. W. Cage, for plaintiff, testified that he "knew the condition of the subway on the 9th of December prior to the trial. He had passed through it several times. He did not remember the dates very well. He passed through and saw the subway, about the time of December

9th. He heard of Mrs. Shaw being hurt about four days after it happened. He went through the subway about that time, and found ice on the floor and dirt.''

J. H. Anderson, for plaintiff, testified that ''he lived in Springfield for twenty years, knew where the Washington Avenue Subway was, that the foot subway was built early in the fall, prior to trial, about a year prior to the trial. The foot subway was on the west of the vehicular subway. He thought he had had occasion to know about the condition of the foot subway on the 9th of December, or within a few days of that time; that he had passed through. He could not tell the condition of the subway to the exact day. He knew of plaintiff having fallen. He had been through the subway on that day or within a few days prior to it, and when he went through, he saw there was slush, ice and water running over it; that it was dirty, muddy, and slick; that 'you could not get through it.' ''

William Skyles, for defendant, testified he was foreman of the gang of workmen that constructed the pedestrian subway that ''the work was started in August, 1926. He believed in January the last work was done on it; that the walkway was turned over the latter part of December, 1926, but that the track supports were still there and were taken out the first of the year. He did not recollect when it was finished so people could walk through.''

He further testified that after ''the new subway was completed, no walking through the old subway along the old walk was permitted. The old walk was cut up in November or December. While the old walk was being taken out, people used the new walk in the subway. The tearing out of the old walk did not interfere with traffic on the new walk. The old walk was torn out to make the passage for cars wider. The traffic was kept on the old walk until the new walk was turned over. Immediately after the new walk was open, the workmen started tearing out the old one. After the work was completed, all three subways were open. By turning over the new subway, the witness meant that it was opened up for the public to use for traffic. As well as the witness could remember, the new subway was opened up the first part of December. The report showed that the actual time was November 12th. Witness did not think that there was anything to prevent the use of all three subways after November 12th. The track was supported temporarily by bridge supports made of wood. The first piles were driven and then cut off, and timbers placed on top of them. When these timbers were moved, the work was entirely completed. The witness' attention was called to the fact that reports showed that the track supports were taken away December 9, 1926, and testified that that was probably right.''

On cross-examination he testified that ''The foot subway was turned over to foot traffic on November 12th, but on the 12th and

13th the old walk was fenced off. . . . The witness was not around much after November 12th; when he left the job, it was clean as the floor. While the foot subway was being built, the pedestrians were still using the old sidewalk on the west side of the west driveway. When the new subway was built, it was opened up and the old walk fenced off, so that it could be torn out and the west driveway made wider. The new tunnel was built to be used by pedestrians, so that they would not have to use either of the old traffic ways.''

It is uncontradicted that the foot subway was constructed by defendant entirely at its own expense and at the request of the mayor of Springfield, in order to permit the removal of the walkway inside the vehicular subway previously built under defendant's tracks by said city.

J. J. Berger testified that the work of installing the overhead lights in the foot subway was ordered done by the city of Springfield and that the city paid for the current consumed and replacement of light bulbs therein.

Defendant contends its demurrer to the evidence should have been sustained because, it is asserted, plaintiff failed to show the foot subway was the private property of defendant but, on the contrary, that plaintiff's evidence affirmatively showed that it was a public thoroughfare dedicated to public use, and under the control of the city of Springfield. It is plaintiff's theory that the foot subway was built by defendant at its own expense on its own property and it invited the public to use same and is therefore primarily liable for any injury to a pedestrian occurring therein as a result of defendant's negligence in failing to keep the premises in a reasonably safe condition. The important point then is whether or not the foot underpass had become a public way at the time plaintiff was injured. There can be no question that Washington avenue, where it passed under defendant's tracks, had been dedicated to a public use and had been accepted as such by the city of Springfield. The long user of this street under defendant's tracks since 1901, when the original subway was built, and constant user and control thereof by the city since that date, together with the fact that the city of Springfield itself built the original subway and paved the street thereunder, is sufficient to establish dedication of the street at least the width of the vehicular subway. After the construction of this vehicular subway in 1901, the grade crossings, theretofore in use, became a thing of the past and both vehicles and pedestrians used only the subway at that point to cross defendant's tracks. Clearly then, any rights the city may have acquired in the old grade crossing were abandoned and the new way was substituted therefor.

It must further be conceded that the old sidewalk constructed on the west side of the west traffic way of the vehicular subway was

within the limits of Washington avenue as used and controlled by the city of Springfield since 1901 (and before) and that, until the new foot subway was constructed, the old sidewalk was under the control of the city of Springfield. If the accident to plaintiff had occurred at a time when she may have been using the old sidewalk, defendant of course would not have been liable. The rule is that "a property owner owes no duty to the public to repair and maintain in a safe condition a sidewalk abutting his property. His obligation is to the city, and the obligation to the public rests on the city, and not on the abutting property owner." [Wright v. Hines, 235 S. W. l. c. 833, and cases cited.]

The new subway was outside the used portion of Washington avenue. Defendant contends the rule followed in the Wright case is applicable here on the theory that the new foot subway had been dedicated to the city of Springfield and that such dedication to a public use was complete at the time of the accident. Some of the essentials of a common-law dedication, upon which defendant relies, should be stated.

The question of intention on the part of the owner to dedicate is an important one. It is said that, "The intention of the owner to set apart the lands for the use of the public, is the foundation and life of every dedication, and whenever this is unequivocally manifested, the dedication, so far as the owner of the soil is concerned, is complete." [8 R. C. L., p. 980.] While that statement of the law is universally recognized, it is also held that mere dedication is not sufficient to constitute a street or sidewalk a public highway in the eye of the law, but acceptance by the municipality is essential to a complete dedication, especially as carrying with it the municipal duty to keep the property dedicated reasonably safe from defects. [Benton v. St. Louis, 217 Mo. 687, l. c. 702, 118 S. W. 418.]

It has been held that long-continued user by the public is in itself sufficient to show an acceptance by implication. [Hanke v. St. Louis, 272 S. W. 933; Benton v. St. Louis, supra.] But such an inference certainly could not be drawn from a user of short duration. In fact, some of the cases seem to hold that even long-continued user by the public must be accompanied by possession or some act of acceptance on the part of city authorities. [Downend v. Kansas City, 156 Mo. l. c. 71, 56 S. W. 902.] However, long-continued user is not essential in establishing common-law dedication. As was said in Drimmel v. Kansas City, 180 Mo. App. 339, l. c. 345, "where there is evidence from which a valid common-law dedication of a street can be reasonably inferred, then, if there is also evidence from which the city's recognition of that street as a city street and its invitation to the public to sue it as such can be implied, the mere fact that such common-law dedication may not have existed for ten years will not relieve

the city." The view of defendant in this case that dedication and acceptance may, under some circumstances, concur on a single day and complete dedication take place *instanter*, is supported by substantial authority. [18 C. J. 74; Heitz v. St. Louis, 110 Mo. 618, 19 S. W. 735; McGrath v. Nevada, 188 Mo. 102, 86 S. W. 236.]

Where long-continued user is not relied on, the acceptance may be shown by acts of the municipality from which acceptance of the dedication may be inferred. So in the case at bar the installing and maintaining of a number of lights in the foot subway and the payment of the light bills by the city of Springfield, are strong circumstances tending to show acceptance of the dedication, although such facts perhaps would not, in every case, be conclusive. [Wright v. Hines, supra; Benton v. St. Louis, 217 Mo. 1. c. 709.] Downend v. Kansas City, 156 Mo. 67, seems to hold the placing of a light at a street intersection is not an act to be regarded as assuming jurisdiction over an adjoining dedicated street not otherwise recognized by the city authorities. But in considering the question of whether or not a dedication has been made and accepted it is proper to consider the intent, purpose and importance of the dedication to the public. It is said that where the dedication "is beneficial or necessary to the public, acceptance will be implied from very slight circumstances." [18 C. J. 95.]

In the case at bar the evidence is undisputed that, before the present foot subway was built, the only passageway for pedestrians across defendant's tracks for two blocks in each direction from Washington avenue, was the sidewalk in the vehicular subway. Its importance to the public therefore, cannot be questioned. At each end the new subway connected with a long-established and existing sidewalk on a public street. There could have been no purpose other than a public one, in building the new subway. That it was not constructed for the convenience of defendant or its employees is apparent. The evidence is undisputed, too, that the new subway was built by defendant at the request of the city of Springfield and to be substituted for an existing sidewalk abutting Washington avenue, a public street. That a new way may be substituted for the old and dedication result thereby, is pretty well recognized in other states. [Sweatman v. Deadwood, 9 S. D. 380, 69 N. W. 582; Fairfield v. Morey, 44 Vt. 239; Green v. Stevens, 49 Ill. 24; Davis v. Oregon Short Line R. Co., 31 Utah, 307, 88 P. 2; Hobbs v. Lowell, 19 Pick. (Mass.) 405, 31 Am. Dec. 145, 8 R. C. L., p. 892.] We believe that rule of law is applicable here. Defendant constructed this new subway and tore out the old, all at the request and with the evident knowledge and consent of the authorities of the city of Springfield; and that city caused conduits for electric lights to be laid in the walls of the

subway and afterwards ordered the subway to be lighted, and paid for the current used. The city also permitted defendant's agents to close up the old public sidewalk and divert the foot traffic to the new subway (the only way then open for pedestrians); the subway was also in use for several weeks prior to plaintiff's accident. Under such circumstances we are drawn to the conclusion that dedication was complete before the accident occurred. Plaintiff herself had used the new subway prior to the accident, as had several other witnesses. The fact that defendant's workmen had not entirely removed all the supports at the time, of plaintiff's injury, we consider of no importance. Under the authorities cited and under the peculiar circumstances of this case, we think, as a matter of law, the duty of the city to keep its sidewalks in repair or in reasonably safe condition, had been imposed prior to the time this accident occurred and that defendant's demurrer should have been sustained. The judgment should therefore be reversed. It is so ordered. *Cox, P. J.,* and *Bradley, J.,* concur.