MARGARET E. BERRY v. EMERY, BIRD, THAYER DRY GOODS COMPANY, a Corporation, EARL GIBSON and JOHN R. GORE, Co-Partners, Doing Business as GIBSON TRANSFER COMPANY, and EDWARD BAILEY, Appellants.—No. 40346.—211 S. W. (2d) 35.

Division One, April 12, 1948.

Motion for Rehearing or to Transfer to Banc Overruled, May 10, 1948.

*Ruth Austin Hall, Clay C. Rogers* and *Mosman, Rogers, Bell & Field* for appellant Emery, Bird, Thayer Dry Goods Company.

810

*Clyde J. Linde* and *Seth S. Lacy* for appellants Earl Gibson and John R. Gore, doing business as Gibson Transfer Company; *Langworthy, Matz & Linde* of counsel.

*Lathrop, Crane, Sawyer, Woodson & Righter* and *Winston H. Woodson* for appellant Edward Bailey.

*E. E. Thompson, Alfred H. Osborne and Popham, Thompson, Popham, Mandell & Trusty* for respondent.

[37] VAN OSDOL, C.—Action for personal injuries against defendant Emery, Bird, Thayer Dry Goods Company, hereinafter referred to as "Dry Goods Company"; defendants Earl Gibson and John R. Gore, partners doing business as Gibson Transfer Company, hereinafter referred to as "Transfer Company"; and defendant Edward Bailey, an employee of Transfer Company. The jury returned a verdict for plaintiff and against all defendants, awarding damages of $30,000; and all defendants have appealed from the resultant judgment.

Herein upon appeal defendant Dry Goods Company contends the trial court erred in refusing to direct a verdict for that defendant, and in the admission and exclusion of evidence. Defendant Transfer Company contends there were errors committed in refusing to direct a verdict for such defendant, and in the giving of instructions. All defendants assert the verdict was grossly excessive, and defendant Transfer Company says the verdict was so excessive as to show bias and prejudice on the part of the jury.

In the early afternoon of October 23, 1944, plaintiff-respondent, Margaret E. Berry, 54 years old, was walking eastwardly on the public "heavily trafficed" sidewalk, 12 feet 3 inches wide, in front of defendant Dry Goods Company's store which abuts the north side of 11th Street between the intersections of that street with Walnut and Grand Avenues in Kansas City; and defendant Bailey was backing defendant Transfer Company's Dodge "ton and a half straight" truck into a parking space along the curb in front of the store, one of the largest retail stores in "downtown" Kansas City. There was evidence tending to show the truck came into contact with a street-light standard or pole set in the concrete of the sidewalk 87½ feet east of the east curb of Walnut Avenue. At or near its base, the standard had for some time been cracked throughout approximately 56% of its circumference. The standard was broken off by the "kinetic force" of the contact and, in falling, struck plaintiff, knocked her down, and severely injured her.

Plaintiff alleged that the light standards and fixtures thereon were owned, controlled and maintained by defendant Dry Goods Company, and were negligently maintained in that the standards (particularly the one involved in the instant case) were cracked, rusted and deteriorated, and [38] likely to be knocked over; that Dry Goods Company was negligent in maintaining the particular standard after it had been broken; and that, having knowledge of the standard's insecure, unsafe and dangerous condition, Dry Goods Company was negligent in failing to remove, remedy, abate or repair the standard or its unsafe condition. And plaintiff alleged defendants Transfer Company and Bailey were negligent in permitting some part of their truck to protrude over, collide with and break off the standard, causing it to strike plaintiff. Dry Goods Company denied its legal responsibility for plaintiff's injury; and alleged the light standard had been dedicated to public use, had been accepted by Kansas City, and was in City's exclusive control.

Examining first the assignment of error in refusing to direct a verdict for defendant Dry Goods Company—that Company contends Kansas City by charter and ordinance had assumed exclusive control of street lighting; that it was the duty of the City, not the duty of the abutting property owner, to keep the sidewalk and "appurtenances" in repair; that the light standard when attached to the sidewalk became a fixture attached to the land and had been dedicated to public use; and that an ordinance of Kansas City prohibited the removal of the standard. Hence, Dry Goods Company argues, it had no right or duty relating to the standard. Dry Goods Company further urges the negligence, of defendant Bailey in backing the truck against the standard was the proximate cause of plaintiff's injury, and the "old break" in the base of the standard was but a condition making injury possible, and not a proximate cause of

the injury. These contentions require a further examination of the evidence.

A witness, who was president of Dry Goods Company when plaintiff was injured, testified the light standards, except as replaced, had been in place near the outer edge of the sidewalk on 11th Street "for quite a while." They were there when he became connected with Dry Goods Company's store in 1929. Since his connection with the store, Dry Goods Company had at all times maintained and repaired and replaced the standards. Two or "maybe four times, something like that" standards had been knocked down upon the sidewalk, and such standards were replaced from a stock of standards which Dry Goods Company owned and kept in its warehouse. Dry Goods Company made "no contact" with Kansas City regarding the replacement or maintenance of the poles. (It may be inferred there is an arcade along the south, 11th Street, side of the store building, on the north side of which arcade are windows displaying merchandise for sale in the store.) The witness said the purpose "of those numerous lights along there was to light up the store as well as the street . . . it added to the attractiveness of the store." Before November or December, 1943, Dry Goods Company had generated its own electricity and had illuminated the lights borne by the poles, but thereafter the fixtures were not illuminated. Dry Goods Company was negotiating with the City to light the street, but continued to maintain the standards and inspect and paint them from time to time. Dry Goods Company at all times assumed the position it "owned the equipment then installed along 11th Street." The witness did not know whether Dry Goods Company or its predecessor had procured a "permit" from the City to install the lights. He "was aware that the light standards were subject to being knocked over from force from the street side because it had happened."

One Wallace was charged with the duty of maintaining and caring for the physical properties of Dry Goods Company. He had been connected with Dry Goods Company since 1914. The light standards were in place at that time. He did not remember any other pole having been broken off at its base, but he could remember "where they have been displaced, pushed over to a slight extent from the base." Wallace arrived at the scene soon after plaintiff was struck down by the falling pole. A witness testified Wallace there stated the pole was broken, had been that way for some time, and should have been fixed; two other witnesses testified Wallace said, [39] in effect, the pole "should have been replaced about two or three years ago . . . they hadn't done anything about it because the city was going to put new lighting on that street there."

Dry Goods Company rendered a statement to Transfer Company for the value of the broken standard.

A vain search had been made by a witness, City's Traffic Engineer, for the record of a permit for the installation of the light standards herein mentioned. "In so far as Kansas City does the lighting, it is under our department." The witness stated he had custody of a copy of the contract of City with a "Light Company which owns and operates all of the street lights for Kansas City." His department had no record indicating the presence or maintenance of lights for the City on 11th Street between Walnut and Grand.

The standard in question was about 12 feet in height and bore crossarms upon which were electric light fixtures, bulbs and globes. It weighed 700 to 750 pounds. It was round and at its base was approximately 12½ inches in diameter. It was of cast iron and hollow, and the thickness of its shell or wall was about 9/16ths of an inch. Cast iron is commonly used for lamp posts, and cast iron is brittle. A pole cracked halfway through would not have half its original strength. It would have just a fraction, "very, very small fraction of its original strength." When a substance is cracked there are "stresses at the root of the crack." The "old break" through 56% of the base wall was on the southwest side of the standard, so that when the truck came into contact with the standard the force of the moving truck was in some degree "moving with" the "old break" in the base wall. The base of the standard had been affixed to and was supported by a rectangular metal plate about 18″ x 24″. Sometime after the standard had been set, the sidewalk had been resurfaced and the supporting plate was entirely covered with concrete.

The truck broke the standard off near its base and the edges of the broken wall were irregular and jagged. Some of the jagged break in the circumference was below, some above, the surface of the sidewalk. Witnesses for plaintiff stated the "rusty part" on the southwest side was 1½ inches above the sidewalk surface; witnesses for defendant testified the "old break" was below the surface of the walk.

The most southerly point on the circumference of the base of the standard was 4 to 4 3/4 inches from the outer (south) edge of the curb, but the standard was tapered from its base so that at a point about 2 or 2½ feet above the base the south surface of the standard was 7 or 8 inches from a vertical line projected from the outer edge of the curb. The sidewalk at the curb line is about 6 inches above the surface of the street. The sides of Transfer Company's truck overhung the truck's wheels about 6 inches. The rear end of the truck bed extended back from the rear wheels approximately 3 feet and 7 inches. The distance from the surface of the street to the "level" of the truck bed was 3 feet and 3/4ths of an inch.

The defendant Bailey testified he was moving the truck one to two miles per hour in backing into the parking space. The truck was loaded with merchandise. The weight of the truck including its load

was about four tons. An eye witness testified, "the rear end (of the truck) on the very extreme right side or the right side near the rear . . . hit the light pole. . . . The pole was knocked over diagonally across the sidewalk and it struck a woman . . . when it fell. . . .' The pole had evidently been cracked because a good portion of it had showed signs of rust, heavy rust." '

This case is not an action between Kansas City, owner of the land on which the sidewalk was constructed, in which City is claiming the standard cannot be removed because it was erected on City's land without City's previous consent, as was plaintiff, a real property owner, claiming a building erected on plaintiff's land by a railroad in the case of Hunt v. Missouri Pac. Ry. Co., 76 Mo. 115, cited by defendant Dry Goods Company. Nor is this a case wherein Kansas City is claiming the standard as part of the realty because of any reverter upon [40] abandonment of an easement, as was defendant in the case of Missouri Pac. R. Co. v. Bradbury, 106 Mo. App. 450, 79 S. W. 966. Nor is this a case wherein City is claiming the ownership of the standard because erected without license upon public lands, as did the City of Monterey claim the ownership of a building in the case of Yokohama Specie Bank v. Unosuke Higashi, 56 Cal. App. 2d 709, 133 Pac. 2d 487. Nor is the question whether the standard could be subjected to a mechanics' lien the subject matter for a court's comment, as in the case of Griffith v. Happersberger, 86 Cal. 605, 25 Pac. 137. And in our case the only pertinent evidence negatives any intention of Dry Goods Company to dedicate the lighting fixtures to the public use or any acceptance of them in such use by the City. Our case differs in this respect from the case of Shaw v. St. Louis-San Francisco R. Co., 223 Mo. App. 1008, 9 S. W. 2d 835, cited by Dry Goods Company.

A city has the duty to maintain its sidewalks in reasonable repair, the city has the exclusive control of its sidewalks, and the owner or occupant of a building abutting a sidewalk is not liable, in the absence of statute, for injuries to a traveler through failure to maintain the sidewalk in repair if the owner or occupant did not cause the necessity for repair, nor from a defect in the walk he did not create, but he is liable where by his affirmative act he creates a dangerous condition, or creates or maintains a nuisance. Riley v. Woolf Bros., 236 Mo. App. 661, 159 S. W. 2d 324; Tower v. City of St. Louis, 235 Mo. App. 1026, 148 S. W. 2d 100; Callaway v. Newman Mercantile Co., 321 Mo. 766, 12 S. W. 2d 491; and State ex rel. Shell Petroleum Corporation v. Hostetter, 348 Mo. 841, 156 S. W. 2d 673. In the Callaway case a steel frame with glass prisms had been constructed in the sidewalk level, and the City had approved and accepted the sidewalk so constructed. And see Breen v. Johnson Bros. Drug Co., 297 Mo. 176, 248 S. W. 970. In these cases the abutting property occupier was held not to be liable for subsequent breaks

in the prisms not occasioned by the occupier's negligence. Although the prisms were inserted in the sidewalks to admit light into the basements of the abutting buildings, the prisms became parts of the surfaces of the sidewalks, and the sidewalks when so constructed were smooth, level and entirely free from any obstruction or opening whereby a pedestrian might encounter any danger by tripping or falling. See also Sheridan v. City of St. Joseph, 232 Mo. App. 615, 110 S. W. 2d 371 (a stepoff in a sidewalk built with the City's approval). These cases are to be distinguished from those where an owner or his tenant makes an extraordinary use of the sidewalk for his own convenience, such as the construction and maintenance of a cellar stairway therein, whereby he owes a duty to the public to exercise reasonable care in maintaining the cellarway in a reasonably safe condition for use of the public as a part of the sidewalk. State ex rel. Shell Petroleum Corporation v. Hostetter, supra; Callaway v. Newman Mercantile Co., supra.

There was evidence tending to show Dry Goods Company or its predecessor set the standards and there was no evidence City had accepted the standards and was exercising *exclusive control* over them as a part of the exercise of its power to light the streets of Kansas City, but on the contrary there was evidence tending to show Dry Goods Company continued to exercise *control* of the standards and to maintain them. It may be inferred City had not undertaken to light 11th Street in front of Dry Goods Company's store, and Company had voluntarily undertaken to do so.

It seems the standards were not such as would constitute a nuisance when erected. They were similar to those ordinarily placed in sidewalks for street lighting in cities. Although the lights on the standards illuminated Dry Goods Company's store, they also served to illuminate the sidewalk and street, and consequently the standards were not such an extraordinary use of the sidewalk for the own exclusive benefit of an occupant of an abutting building as were the cellar stairways, coal chutes, meter boxes, etc., involved in those cases referred to in State ex rel. Shell Petroleum Corporation v. Hostetter, supra; and in Callaway v. Newman Mercantile Co., supra. Nevertheless, the standards, it may be reasonably inferred, [41] were the property of Dry Goods Company, who (or its predecessor), in setting standards in the sidewalk, had subjected the sidewalk to a user additional to its use for traveling. While the traveler was benefited by the illumination of the sidewalk and street, it may be inferred Dry Goods Company (or its predecessor) put the standards in for its own benefit primarily in providing illumination of the sidewalk, and of the arcade and the display windows of its store. Having the ownership, or having assumed the responsibility of the ownership, *control* and maintenance of the standards so set in the sidewalk, Dry Goods Company had the duty to exercise due care in main-

taining them in a reasonably safe condition for travelers. See 25 Am. Jur., Highways, sec. 365, p. 659. "It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." Marks v. Nambil Realty Co., 245 N. Y. 256, 157 N. E. 129. See also Willis v. Atchison, T. & S. F. Ry. Co., 352 Mo. 490, 178 S. W. 2d 341; Bartlett v. Taylor, 351 Mo. 1060, 174 S. W. 2d 844.

█ Defendant Dry Goods Company contends the testimony of statements of Wallace was inadmissible because hearsay, and that reversible error was committed in admitting the testimony of the statements into evidence. Plaintiff's counsel had so framed the questions as to elicit answers quoting the statements of Wallace with respect "to the condition of the light pole." Wallace's statements of the pole's condition were admissible as tending to show Dry Goods Company's knowledge of the standard's defective condition. Corley v. Kroger Grocery & Baking Co., 355 Mo. 4, 193 S. W. 2d 897; State ex rel. S. S. Kresge Co. v. Shain, 340 Mo. 145, 101 S. W. 2d 14; O'Leary v. Scullin Steel Co., 303 Mo. 363, 260 S. W. 55. Some parts of the answers of the witnesses quoting Wallace's statements went beyond the purview of the questions propounded to the witnesses, and included statements of Wallace which tended to prove negligence; but counsel for Dry Goods Company did not move to strike the testimony of such parts of the quoted statements or in any way make known to the trial court what action should have been taken.

█ Defendant Dry Goods Company proffered a Charter provision giving City of Kansas City the power to light the streets; and a section of the Revised Ordinances providing that no person should remove or disturb any light post without first having a written permit from the City Engineer. And sections of the Administrative Code were proffered, which sections provide the Superintendent of Street Lighting shall have personal charge and supervision of street lighting and the duties of seeing that all contracts for construction and maintenance of light posts are complied with, of making recommendations for the location or removal of lights, of examining the condition and number of lights, and of seeing that lights were located in accordance with all contracts of City. We think the trial court correctly excluded the proffered evidence; such evidence could not have but confused the issues. None of the proffered provisions of charter and ordinance, and no other evidence, tended to show the City was exercising its power to light 11th Street between Walnut and Grand Avenues in the City, or had assumed the exclusive control of the standards in question.

█ A defendant is not legally responsible in negligence unless he omits precautions a reasonably prudent man would have taken to guard against an injury, but this does not mean a defendant must have

anticipated the very thing that happened if a defendant in the exercise of ordinary care should have known a situation was unsafe and that some injury was likely to result, not that such was a remote possibility, he is duty bound to fend against it. Guthrie v. City of St. Charles, 347 Mo. 1175, 152 S. W. 2d 91, and cases therein cited; Lloyd v. Alton R. Co., 348 Mo. 1222, 159 S. W. 2d 267. It could not be certainly said the standard would have been struck over by the truck if the standard had been in sound condition. The cracked standard had but a ''very, very small fraction of its original strength.'' It could be reasonably said that but for the cracked standard plaintiff [42] would not have been injured. We have seen the defective standard was set in a sidewalk heavily traveled by pedestrians and in close proximity to the low curb along and south of which vehicles moved in the vehicular portion of the busy street. The parking of vehicles along and parallel with the curb was authorized (photographs introduced into evidence disclosed coin-operated parking meters along the curb) so that the overhang of the sides and rears of vehicles being angled backwardly into the parking spaces could come into contact with the standard. We believe it could be reasonably found an ordinarily prudent man should have known it was unsafe to maintain the standard, in the circumstances, in its fragile cracked condition, and that some resultant injury was probable. In the situation the backing of the truck into the standard was not such an extraordinary occurrence as to be held, as a matter of law, to interrupt the causal connection of Dry Goods Company's negligence; and the question whether the negligence in maintaining the standard in its defective cracked condition was a proximate cause concurring with the negligence of defendant Bailey in proximately causing plaintiff's injury was for the jury. Carr v. St. Louis Auto Supply Co., 293 Mo. 562, 239 S. W. 827; Byars v. St. Louis Public Service Co., 334 Mo. 278, 66 S. W. 2d 894; Giles v. Moundridge Milling Co., 351 Mo. 568, 173 S. W. 2d 745; Stumpf v. Panhandle Eastern Pipeline Co., 354 Mo. 208, 189 S. W. 2d 223; Floyd v. Thompson, 356 Mo. 250, 201 S. W. 2d 390.

Defendant Transfer Company contends the trial court should have sustained Transfer Company's motion for a directed verdict. It is urged the undisputed evidence conclusively showed the defendant Bailey, when plaintiff was injured, had deviated from his employment and was engaged in a mission of his own. See Pesot v. Yanda, 344 Mo. 338, 126 S. W. 2d 240.

It was admitted the truck driven by defendant Bailey belonged to defendant Transfer Company and that defendant Bailey was in the general employ of that Company. These admitted facts were barely sufficient in themselves to give rise to the procedural presumption that defendant Bailey, who was driving the truck, was acting within the scope of his employment when plaintiff was injured and to thus

make out a prima facie case under the doctrine of respondeat superior. State ex rel. Waters v. Hostetter, 344 Mo. 443, 126 S. W. 2d 1164. Now Transfer Company introduced evidence tending to show that defendant Bailey had been instructed by his employers to report to the warehouse of the Firestone Company in North Kansas City and transport merchandise to Watson Brothers (9th and Wyoming) in west bottoms Kansas City (Missouri); and that, after defendant Bailey had loaded the merchandise at the Firestone warehouse, he deviated from the route ordinarily "pursued" for making the haul, and went up to 11th Street about eleven blocks "out of his way" to transact his own personal business.

It is said the procedural presumption, mentioned supra, is destroyed by the introduction of contrary substantial evidence. And when the procedural presumption is so destroyed, if there is no evidence for plaintiff except the bare underlying minimum to support the presumption, the underlying evidence alone is insufficient to raise the essential inference that the tort feasor was acting within the scope of his employment and to make a prima facie case for the jury. However, the underlying evidence required to raise the presumption, although the presumption has been destroyed by a defendant's evidence, may be considered by the trial court upon motion to direct a verdict for defendant (an alleged employer), together with other evidence introduced which may aid that required to raise the presumption, and the whole evidence considered together sometimes may be sufficient to support the necessary valid inference that the tort feasor was, at the time, acting within the scope of his employment. State ex rel. Waters v. Hostetter, supra.

As we have said, it was admitted defendant Bailey was in the general employ of and was at the time driving a truck owned by defendant Transfer Company. There was also evidence introduced tending [43] to show Company was engaged in the business of "local transfer and hauling" in and around but not beyond the immediate confines of Kansas City. Defendant Bailey was employed by Transfer Company as a driver of one of Transfer Company's eight or nine trucks which were all hauling over the City. Defendant Bailey was given no special orders relating to the route he was to follow. He was, at the time plaintiff was injured, driving a truck assigned to him, a vehicle appropriate for hauling. The truck was loaded with various items and parcels of merchandise such as might be picked up and hauled in and around and delivered in Kansas City. He was driving the truck, at the time, during his regular working hours, within the confines of Kansas City and in that part of City's commercial or shopping district where wholesale merchandise is delivered and received by merchants and sold retail and delivered to people in and around Kansas City. We believe the evidence and the admitted facts summarized in this paragraph are sufficient to support the

necessary inference that defendant Bailey, at the time plaintiff was injured, was acting within the scope of his employment.

Since the evidence was sufficient in supporting the necessary inference, it was the province of the triers of the fact, not that of the trial court, to either indulge the inference by giving value and weight to the supporting evidence or to give value and weight to the contrary evidence tending to show defendant Bailey had, at the time, departed from the duties of his employment and was engaged in a pursuit of his own. Compare Mauzy v. J. D. Carson Co., Mo. App., 189 S. W. 2d 829; and again examine State ex rel. Waters v. Hostetter, supra.

■ Transfer Company's contentions of error in plaintiff's given Instruction No. 3 and Dry Goods Company's Instruction C are hypercritical in pointing to the use of terms rather than to any real error in the instructions which should be held prejudicial. There was hypothesized in Instruction No. 3, "if you find . . . Bailey was acting within the scope of his employment . . . and performing a *service* for said defendants (Transfer Company) in the furtherance of their business . . ." (Our italics.) Transfer Company says the word "service" was susceptible of the construction by the jury that, though the jury thought defendant Bailey had otherwise departed from the duties of his employment, the jury could have considered he was acting within the scope of his employment because the evidence showed it was one of his duties to guard the truck and merchandise it contained. Dry Goods Company's Instruction C cautioned the jury to decide the case "precisely as you would a case between two individuals." This language, Transfer Company asserts, could have been considered by the jury to mean their verdict should be for or against all defendants. While the use of the word "two" was not a happy one, the Instruction continued advising the jury that the fact plaintiff was an individual and one of the defendants was a corporation should not be taken into consideration in arriving at a verdict, and, in view of the Instruction submitting the defenses of the several defendants, we believe the use of the word "two" was not misleading. We rule these contentions of error adversely to Transfer Company. No other contentions of error were made relating to the two instructions.

■ Plaintiff was painfully, seriously and permanently injured. She suffered a comminuted fracture through the upper third of the right tibia and a fracture of the fibula just below the head of that bone. There was no fracture involving the knee joint itself, nor of the ankle joint, but there was a comminuted fracture of the heel bone. The third and fourth ribs on the right side of the chest were broken about one inch from the spine. Plaintiff was in hospitals for about six weeks. Her right leg was placed in a cast. The broken ribs are now mended but are overlapping. An operation was performed

November 15, 1944, the fractured heel bone was set, and in order to sustain the fracture of the tibia "some pins" attached to a plastic bar were placed through the bone. Nine pins in all were placed through the bones of the leg and the heel. There are noticeable scars where the pins had been. The mended right heel [44] is almost twice as thick as the normal one on the left. The right heel is sensitive as if some bony substance were protruding through the flesh. There is a bony formation near the knee but not in the region of the knee joint. The knee joint appears abnormally square on the right side. The disability of the ankle joint is about forty per cent and the fracture of the leg about fifteen per cent, making the disability "in the neighborhood of about fifty (fifty-five) per cent at the knee joint." Plaintiff had a congenital curvature of the spine. Abnormal spur formations in the lower vertebrae were not due to plaintiff's injury, but were of "several years' standing." The trauma contributed to the limitation of the use of the spine, and was a contributing cause of pain in the back. Plaintiff now cannot do the kind of work which would require her to be on her feet and move around, such as operating a machine in a garment factory or untrimming hats and carrying hats around in a cleaning establishment, which activities she had been previously engaged in at a wage of $18 per week. The "major portion" of the "present disability . . . is in the heel and ankle of the right leg." Plaintiff has lost weight, is nervous, and continues to suffer pain in her back, neck, leg, ankle and foot —"every day it hurts."

Considering the evidence relating to plaintiff's injuries in the light most favorable to her, we hold the jury's award was excessive by $12,000. But we do not say the award was so excessive as to demonstrate bias and prejudice on the part of the jury. While plaintiff has sustained grave, painful and permanent injuries, most of the permanent injuries are confined to the right foot and leg below the knee. It is indeed difficult to justly measure compensation in money. The measure should be according to the particular facts of the cause as viewed in a relation to economic conditions and with a regard to reasonable uniformity of awards. Jones v. Pennsylvania R. Co., 353 Mo. 163, 182 S. W. 2d 157. Plaintiff's injury to her right leg, although painful, might not be considered a more serious injury than had she lost the member. But we do not lose sight of the injury's contribution to the loss of mobility of the spine and her continuing pain, her loss of weight, and her nervous condition. Compare Bowman v. Standard Oil Co., 350 Mo. 958, 169 S. W. 2d 384, decided in 1943, award of $20,000 reduced by the trial court and herein upon appeal to $10,000; Christiansen v. St. Louis Public Service Co., 333 Mo. 408, 62 S. W. 2d 828, decided in 1933, award of $18,000 reduced to $15,000; Pitcher v. Schoch, 345 Mo. 1184, 139

824

S. W. 2d 463, decided in 1940, award of $18,000 reduced to $13,000.

If within ten days plaintiff remits $12,000 of the judgment, the judgment will stand affirmed as of the date of its rendition; otherwise, the cause should be reversed and remanded.

It is so ordered. *Bradley* and *Dalton, CC.*, concur.

PER CURIAM:—The foregoing opinion by Van Osdol, C., is adopted as the opinion of the court. All of the judges concur.