OPINION OF THE COURT
Emmett J. Schnepp, J.
As a result of the use by plaintiffs in September, 1974 of a teat dip manufactured by the defendant, 59 cows in their herd *818 of 130 milking cows were injured. The teat dip was designed to kill germs causing infectious mastitis, an inflammation of the udder which destroys milk producing cells. The use of the dip severely burned the udders and teats of the cows, 39 of which were immediately rendered useless as milk producing units and were sent to slaughter. Thereafter, 9 additional milking cows injured by the use of the substance were sold for beef, while 11 cows, not as seriously injured during the incident, were kept in the herd. The question of defendant’s liability is not controverted and the sole question before the court is the amount of plaintiffs’ damage.
As with personal property generally, the measure of damages for injury to, or destruction of, an animal is the amount which will compensate the owner for the loss and thus return him, monetarily, to the status he was in before the loss. Where the animal has a market value, the market value at the time of the loss, or the difference in market value before and after injury will generally be the measure applied. Any special value, particular qualities, or capabilities are generally considered as factors making up market value. For example, when an owner has received the market value of an animal, he will have been compensated for any use he might have made of the animal for breeding purposes. The market value may be enhanced because the animal is carrying unborn young, but the young have no value apart from the mother. Also, the loss of produce of an animal is an item of consideration in determining market value, rather than a separate item of damages. The high production rate of a slaughtered cow is to be considered as a particular quality along with breed, age, condition and other factors in computing the animal’s market value.
Proof was presented as to the significance of whether the slaughtered cows were registered or grade animals. Defendant’s expert maintains that registered cows are worth 20% more than grade cows. Registration allows a dairyman to trace the lineage of the animal and aids him to best evaluate the value of future offsprings. There is no certainty that a registered animal will produce more milk than a grade cow. Thus, registration is only important if an owner intends to sell his animals. Plaintiffs raised and maintained their dairy herd not for their eventual sale but for milk production purposes. It appears, therefore, that registration would be a superfluous act and expense for dairymen, like plaintiffs, interested only *819 in producing milk. Plaintiffs’ appraiser testified that about 40% of the lost cows were registerable. This along with other factors was taken into consideration by him in determining their fair market value.
It is found that 48 cows were required to be disposed of by reason of their injuries due to the use of the dip and that the fair market value of these cows totals $43,742. Subtracting a salvage value of $10,441 for the slaughtered animals, plaintiffs’ loss equals $33,301.
In addition, plaintiffs are entitled to recover the loss of profit for the time period required to replace the slaughtered cows with cows of equal quality. Plaintiffs also may recover the calculable loss in milk production caused by the incident’s negative impact on the milk production level of the remaining unaffected cows and the cows which were injured and "kept for awhile”.
The generally accepted rule is that where it is shown that a loss of profits is the natural and probable consequence of the act or omission complained of, and their amount is shown with reasonable or sufficient certainty, there may be a recovery. Such damages must not be speculative, contingent or uncertain and there must be reasonable proof of their amount. Any reasonable method of estimating a prospective profit is acceptable. Absolute certainty is not required. (See 25 CJS, Damages, §§ 42, 90.)
Plaintiffs, however, may not recover the total loss of production for the whole herd as compared to previous years. Prior to December 31, 1974, plaintiffs purchased 55 young heifers to replace the 39 cows destroyed. The proof shows that young cows produce less milk than more mature cows and would necessarily reduce the average production rate of a herd. They are expected to live longer and thus produce milk for a longer period of time, while gradually increasing in their milk output. Plaintiffs intentionally balanced the benefit of investing in younger cows against the expected loss in their production during their early years. The low production rate of the replacement cows did not result from the defendant’s negligence but from plaintiffs’ business decision.
The fair market value of the slaughtered cows does not adequately compensate the plaintiffs for their loss. They are entitled to the profit that the 39 cows, the best milk producers in the herd, would have generated until replacement cows of equal quality were available. Proof establishes that replace *820 ment cows of comparable quality were available in the market three months subsequent to the accident. Although plaintiffs opted to buy younger cows as replacements, they still may recover this foreseeable and proximately caused loss for the three-month period. The milk produced by the young replacement heifers, during these months, however, must be considered as a factor mitigating this item of damages. Plaintiffs loss for this element of damage totals $7,512.44.
The court next considers the element of lost profits caused by the accident’s impact on the production rate of the remaining cows in the herd. Although the experts disagreed as to whether the introduction of new cows into a herd would affect their production level, it appears that these remaining cows produced significantly less milk when the replacement cows were added to the herd. Other factors such as calving interval, management practices, feed mixture, quality of breeding and disease were cited as possible causes for the effect on production. Despite some proof as to the increased calving interval in the herd and a decrease in the amount of grain used in the feed, the management practices of plaintiffs are found to be excellent. Weighing all the evidence before it, the court finds that the introduction of the replacement animals into the herd caused plaintiffs to sustain a production loss.
To determine the time period for which these damages are recoverable, the court must determine when the production level of the unaffected cows and the injured cows which remained in the herd returned to the level of output maintained prior to the incident. By adjusting the daily production rates based on a 305-day lactation period to correspond to the monthly production rates computed on a full year calendar, the court calculated the average monthly production rates prior to the incident of the damaged and slaughtered cows, the damaged and "kept for awhile” cows, and the unaffected cows and the average monthly production rate of the replacement cows. The court also determined the amount of milk produced each month subsequent to the incident that was attributable to the 20 cows affected but "kept for awhile” and the 71 unaffected cows. This amount was then compared to levels of production attributed to these same 91 cows prior to the incident. The court deems the difference between the two amounts to be plaintiffs’ loss resulting from the negative impact the incident had on the milk production levels of the *821 remaining portion of the herd. The loss of milk multiplied by its selling price for the corresponding month expresses plaintiffs’ loss in dollars.
The production level of this section of the herd rose steadily during the first half of 1975 and reached and surpassed former production in March, 1975. The drop in production level in the later half of 1975 cannot be deemed to be proximately caused by the accident; it is not clear from the record which of several factors contributed substantially to the decrease in milk output. Plaintiffs’ proof fails to establish that any production loss subsequent to February, 1975 was a direct result of the accident. It is found that plaintiffs’ loss for this period from September 29 to March 1 totals $13,010.57.
Special damages (undisputed) $ 1,306.00
Fair market value of slaughtered cows less salvage 33,301.00
Loss of profit for three-month period subsequent to incident 7,512.44
Loss attributed to the incident’s impact on the remaining cows 13,010.13
$ 55,129.57 Total