Carolyn ASHER, Appellant-Respondent,

v.

BROADWAY–VALENTINE CENTER, INC., Appellant-Respondent,

Broadway National Bank, Respondent,

Tom Martin Construction Co., Inc., Appellant-Respondent.

No. WD 35956.

Missouri Court of Appeals, Western District.

May 14, 1985.

Thomas Hankins, Kansas City, for Carolyn Asher; Gunn, Hall & Stahl, Kansas City, of counsel.

Robert O. Jester, Kansas City, for Broadway-Valentine Center, Inc.; Ensz and Jester, Kansas City, of counsel.

F. Allen Speck, Kansas City, for Broadway Nat. Bank; Sherman, Wickens, Lysaught & Speck, Kansas City, of counsel.

Gene C. Morris, Kansas City, for Tom Martin Const. Co., Inc.; Field, Gentry, Benjamin & Robertson, Kansas City, of counsel.

Before PRITCHARD, P.J., and SHANGLER and DIXON, JJ.

PRITCHARD, Presiding Judge.

Plaintiff Asher brought her action for personal injuries and property damage which she suffered when a portion of the shopping center parking lot pavement at 3600 Broadway collapsed beneath her car on March 3, 1979. Claims were made against the Broadway-Valentine Center, Inc., on various allegations of negligent failure to construct, maintain and repair the pavement and its subsurface in a reasonably safe condition and failure to warn of the unsafe condition. Similar allegations were made against the Broadway National Bank, but plaintiff dismissed her claim against it on the first day of trial. Plaintiff's claim against the Tom Martin Construction Co. was on the theory of negligent back-filling and soil compaction after it installed pneumatic tubes running underground from the bank to and from its facility located in the southeast corner of the parking lot. The trial court directed a verdict in favor of Tom Martin Construction Co. on plaintiff's claim against it at the close of her evidence.

The jury returned a verdict for plaintiff in the amounts of $75,000 for personal injuries and $500 property damage against Broadway-Valentine Center, but the trial court set aside the verdict and granted a new trial to it upon the stated ground "that the Court erred in granting the motion for directed verdict of Tom Martin Construction Company."

Both plaintiff and Tom Martin Construction Co. say that the trial court's granting of the new trial to Broadway-Valentine on the stated ground, not being a discretionary ground, was error. They reason thus: Plaintiff sued both Broadway-Valentine and Tom Martin Construction Company as co-defendants, i.e., joint tort-feasors. Broadway-Valentine never did file a cross-claim for indemnity against Tom Martin Construction Co. for a determination of the percentages of their fault as contemplated by *Missouri Pacific Railroad Company v.*

Whitehead & Kales Company, 566 S.W.2d 466, 473 (Mo. banc 1978); and Rule 55.32(f). Such a cross-claim, had it been filed, would have then constituted a separate, independent claim from the underlying tort claims of plaintiff against both these defendants, and if the cross-claim had been asserted, it would have been error as to Broadway-Valentine in directing Tom Martin Construction Co. out of the case. See *Rowland v. Skaggs Companies, Inc.*, 666 S.W.2d 770, 774 (Mo. banc 1984), and *State ex rel. General Electric Co. v. Gaertner*, 666 S.W.2d 764 (Mo. banc 1984), holding that an independent right of contribution among tortfeasors exists regardless of the running of the statute of limitations on plaintiff's underlying tort action.

Broadway-Valentine, under the posture of this case (lack of pleading of a cross-claim for indemnity), is not aggrieved or prejudiced by the direction of a verdict for Tom Martin Construction Co., which was done upon the ground that plaintiff had failed to introduce substantial evidence of the latter's negligence. The ruling was on a matter of law, and was not therefore based upon any discretionary ground. *Swift v. Bagby*, 559 S.W.2d 635, 637[4–7] (Mo.App.1977); *Medical West Building Corp. v. E.L. Zoernig & Co.*, 440 S.W.2d 744, 751 (Mo.1969), and cases cited. "A defendant may not complain of errors whose only effect was to absolve codefendants of liability and thus to prevent a joint verdict against both defendants. (Citing cases.)" *Myers v. Bi-State Development Agency*, 567 S.W.2d 638, 643[8] (Mo. banc 1978), where a jury verdict absolved a railroad from liability but held the bus company liable. See also *May v. Bradford*, 369 S.W.2d 225, 227 (Mo.1963). Note that *Gustafson v. Benda*, 661 S.W.2d 11, 16 (Mo. banc 1983), which established the doctrine of pure comparative fault or negligence as between a plaintiff and defendant, stated that the court "[did] not intend to impair the existing right of a claimant to recover the total amount of his judgment against any defendant who is liable."

Plaintiff does not appeal the judgment directing a verdict for Tom Martin Construction Co. She must therefore be deemed to be satisfied with her verdict against Broadway-Valentine, a defendant found to be liable. The trial court was in error in granting Broadway-Valentine a new trial on the ground that it erred in directing a verdict for Tom Martin, because under the above cited cases it has no cause to complain that a co-defendant has been absolved from liability to plaintiff.

Broadway-Valentine contends that the trial court erred in failing to grant its motion for judgment N.O.V. It says that there was no evidence presented by plaintiff that it knew or should have known that there was a void under its parking lot which could have caused it to be unsafe for business invitees such as plaintiff.

Robert Bosley testified by deposition that he was about four feet behind plaintiff's car when it fell into the hole. He had dropped off his wife at the Safeway store on the west side of the parking lot, and then he drove around the lot trying to find a parking place. He described the parking lot as being in bad shape with chuckholes all over the driveway, "some in there maybe a foot round, maybe two foot round." There was a lot of gravel scattered around everywhere from cars splashing it out of the holes. The sewer drains were all messed up by not being set properly in the ground, "Well, they were sticking up. One corner might have been pushed up and the other one might have been pushed down in the ground." After the car was taken out of the hole he looked in it, it being 2½ to 3 feet round and probably 4 feet deep. There was gravel and blacktop in the bottom. There were puddles of water everywhere on the whole parking lot. There was a storm drain hole south of the hole where plaintiff's car fell.

William McFall had worked for Broadway-Valentine for four years prior to 1980 in general maintenance and grounds-keeping. In the 2½ years prior to March, 1979, there were always potholes showing up, the biggest of which would range from 3

feet in diameter, and he had put as much as 500 pounds to a ton of asphalt in them on the. average, sometimes having to fill in with dirt or gravel, then reasphalt on top of it. The parking lot had a lot of cracks all over it. The storm drain backed up near the bank and there were problems getting it drained. McFall had seen large trucks drive onto the lot pushing the asphalt down as they drove over it, which would come back up after they left—a pumping action, which happened two or three times a week. In his opinion, the general condition of the parking lot was the ground underneath it was washing away. There had been chunks of asphalt coming up in the area of the big hole, happening in the spring. It is not clear as to the exact time, but prior to March 3, 1979, and after 1976, during McFall's employment, there was one hole that formed in the parking lot about the size of a Volkswagen—3½ to 4 feet wide, 7 to 8 feet long and 3 feet deep, and the ground was washing away from underneath the asphalt which surrounded the hole. McFall started to crawl in the hole to see how far it went, but his supervisor advised him not to do it.

Consulting engineer Willis E. Salyers testified as an expert witness for plaintiff. He was given a hypothetical question incorporating these facts: For 2½ years potholes were always showing up requiring on the average 500 pounds to a ton of asphalt to fill. The parking lot had a lot of cracks in it which had been a problem for about 2½ years. Trucks driving over the lot would push the asphalt down, and after passage it would come back up. A previous hole 7 to 8 feet long, 4 feet wide and 3 feet deep, had formed requiring about 8 tons of material to fill it, and a maintenance man saw that the ground was washing out below the asphalt surrounding the hole. The area drains had a history of being clogged, and surface water would gather and seep down through cracks. He gave his opinion that the condition of the parking lot subsurface was that it was totally saturated with water, leaking and leaching, and probably channeling—running in open streams under the surface. It

was a bad condition causing a considerable weakening of the bearing strata of the soil. As the soil yields, so does the asphalt, and it breaks allowing more water to get into it. A hole of the size hypothesized would require it to be imperative that one find out what caused it, at an engineering cost of $100 or less. Salyers also gave opinion that the collapse of the parking lot (he termed it a collapse not due to a pothole) was due to improper compaction of the corrugated metal tube (about 100 feet long and 4 feet in diameter) with back-fill material, and the lifting of the tube by the construction company (Tom Martin) during the construction process. As noted, the trial court absolved Tom Martin Construction Company by direction of the verdict as to it, from which plaintiff did not appeal, so improper compaction of the tube by it is not here an issue.

Plaintiff has not supplied this court with any authority that the facts of this case supply notice or knowledge to Broadway-Valentine of the dangerous condition of this parking lot, where the surface has collapsed into a void upon a vehicle traversing it. Nor has independent research revealed any such authority. General principles must apply. First, the duty of owners or occupants of lands or buildings to invitees (plaintiff being an invitee), generally, is to use ordinary care to have the premises in a reasonable, safe condition for use in the manner consistent with the purpose of the invitation. Anno. 38 A.L.R.3d 10, 21, § 3. In *Hokanson v. Joplin Rendering Company, Inc.*, 509 S.W.2d 107, 110[1, 2] (Mo.1974), there quoting Restatement of the Law of Torts Second (1965), § 343, stated (paraphrased), a possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land, if he knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and should expect they will not discover or realize the danger, and fails to exercise reasonable care to protect them against the danger. Of course plaintiff here could not be

expected to realize that the parking lot surface would suddenly collapse as she drove over the area.

It is true as stated in Broadway-Valentine's cited cases that it must be shown that it had actual or constructive knowledge of the dangerous condition of its parking lot before it can be liable to plaintiff. Cf. *Pagano v. Kalbrener, Inc.*, 469 S.W.2d 745 (Mo.App.1971); and *England v. Salamon*, 324 S.W.2d 765 (Mo.App.1959), in neither of which cases were the defective conditions existent for a sufficient period of time, that by the exercise of reasonable care, defendants had opportunity to discover and remedy them. At page 768 of the England case, however, there is an exception to the rule stated which is applicable to the facts of this case: "Nor should he be held liable for defects which an investigation might reveal *unless the situation suggests an investigation.*" [Italics added.] In 62 Am.Jur.2d Premises Liability, § 27, p. 259, the exception is stated: "A possessor of premises is not to be held liable for an injury caused by a defect therein of which he had no actual knowledge, even though it might have been revealed if he had made an investigation or inspection, *unless the situation suggests an investigation and the facts are such as to indicate to a reasonably prudent man the likelihood of the existence of some hidden danger to persons lawfully on his property.*" [Italics added.]

For some 2½ years prior to the time that plaintiff's vehicle fell into the hole, on the surface of the parking lot, potholes were always showing up requiring constant repair with large amounts of asphalt. There were cracks all over it, and water backed up onto it from storm drains. Large trucks passing over it caused the surface to pump up and down, indicating that the subsurface support was insufficient. According to McFall, the general condition of the lot was that the ground underneath it was washing away, and there had been a previous large hole formed which showed the ground washing away from its edges. The actual knowledge of

Broadway-Valentine's employee, McFall, as to the condition of the paving and subsurface, is imputable to it. *Maybee v. Missouri Orpheum Corporation*, 238 Mo.App. 537, 181 S.W.2d 771, 774[4] (1944).

According to Salyer, the condition of the subsurface was that it was totally saturated with water seeping down through cracks, and then leaking, leaching and probably channeling in open streams. He testified that it would cost little to investigate and find out what caused the hole to form.

All of the facts and circumstances were sufficient to have given Broadway-Valentine actual and constructive knowledge that something was amiss with respect to the condition of its parking lot, giving rise to a duty of inspection and investigation to discover the existence of hidden danger, and to remedy the situation so as to make it reasonably safe for invitees such as plaintiff coming onto the property. The trial court did not err in failing to grant Broadway-Valentine's motion for judgment N.O.V.

Plaintiff testified that after her injuries of March 3, 1979, her condition was improving until she was involved in a rear-end collision in June, 1981. For that latter accident, she received a prescription for a TENS unit to assist in the control of pain. She also sustained injuries when she fell over her dog in September, 1981, which triggered a recurrence of pain. Then she was again in a rear-end accident, for which she sought medical treatment, one week prior to trial. Instruction No. 9 on damages submitted only "the occurrence mentioned in the evidence" in accordance with MAI 4.01 (1980 Revision). Broadway-Valentine contends that there was error in failing to modify Instruction No. 9, in accordance with Notes on Use "in any case where the evidence discloses more than one event which is claimed to have caused plaintiff's injuries or damages." Plaintiff pleaded only the collapse of the surface of the parking lot as the cause of her injuries, and her verdict directing instruction sub-

mitted *only* that event as a basis for recovery. This indicates that she was not claiming damages by reason of the subsequent accidents. Compare *State ex rel. Mather v. Carnes*, 551 S.W.2d 272, 290 (Mo.App. 1977), holding that an instruction under MAI 4.01 did not require modification as to more than one cause of injury where "[T]he *only occurrence to be found by the jury under the theory of the instructions was whether or not* [the sheriff] failed to attach the airplane under the writ." Although it would have been better practice to have modified Instruction No. 9, no prejudice appears. Besides, there is some duty upon Broadway-Valentine to have requested a correct instruction if it thought that Instruction No. 9 was patently erroneous so as to make its argument more difficult or to have a substantial effect on the jury. *Fowler v. Park Corp.*, 673 S.W.2d 749, 756, et seq. (Mo. banc 1984). The point is overruled.

Broadway-Valentine claims error in the trial court's direction of a verdict against it on its cross-claim against Broadway National Bank, its lessee. The cross-claim pleads for indemnity based on the contractual agreement of the lease, the original of which contained this provision: "28. Lessee shall protect, indemnify, and save harmless the lessor against all damage or claims for damage and all loss, liability or expense, including all costs of attorneys' fees, on account of claims for injuries of any kind whatever, including damage or destruction to property occurring in, on or about said leased premises, or on the sidewalks or approaches adjacent thereto and against any claim for any injury or damage resulting from any work done by lessee on the leased premises, even if undertaken with the consent of the lessor * * *." On March 8, 1976, when the bank desired to build a drive-in facility on the southeast corner of the premises which involved the buried installation of a 48 inch corrugated metal pipe to carry pneumatic tubes to and from the facility to the main bank, this modification of the lease was made: "4. Upon approval of such plans and specifications by the respective parties, lessee at its sole cost and expense, shall diligently proceed to construct said drive-in facility in accordance with said plans and specifications. Lessee shall secure all permits requisite to the construction of said drive-in facility and shall, during the construction thereof, comply with all applicable legal requirements. Said drive-in facility shall be constructed in a workmanlike manner * * *."

Broadway-Valentine pleaded in its cross-claim that if it should be found to be negligent as alleged by plaintiff, it is entitled to be indemnified and held harmless in keeping with the terms of the contractual agreement between it and the bank as hereinabove set forth. It prayed for *complete* indemnification as to any sums that might be assessed against it because of plaintiff's claim for damages and for costs and attorneys' fees.

In *Kansas City Power & Light Co. v. Federal Const. Corp.*, 351 S.W.2d 741 (Mo.1961), plaintiff sought contractual indemnity from its contractor for amounts paid in settlement for personal injuries to two of the contractor's employees. In reversing the judgment for plaintiff, the court discussed the concept of contractual indemnity at page 745, saying that where the parties stand on substantially the same footing, one may agree to indemnify the other against the results of the indemnitee's own negligence, but the intention to do so must be expressed in clear and unequivocal terms, and mere general, broad and all-inclusive language in the indemnifying agreement [as is the case here] is not sufficient to impose liability for the indemnitee's own negligence. It was noted in the *KCPL* case, supra, page 745[3], that there was no specific agreement to indemnify plaintiff against its own negligent acts, which again is the case here. Note the there cited case of *Missouri District Telegraph Co. v. Southwestern Bell Telephone Co.*, 338 Mo. 692, 93 S.W.2d 19, 28 (1935); and see *Midwestern Realty Corp. v. City of Grandview*, 416 S.W.2d 35, 38[2, 3] (Mo.App.1967). It appears that by the case of *Parks v. Union Carbide Corp.*, 602

S.W.2d 188, 190–191 (Mo. banc 1980), that the principles of the *KCPL* case, supra, remain the law, in that "[T]here is no indication of clear and unequivocal terms expressing Chemline's intent to indemnify Carbide for liability for personal injuries caused by Carbide's negligence."

█ Broadway-Valentine argues further that it was entitled to be indemnified by reason of the bank's alleged failure to perform the work of installing its facility in a workmanlike manner. That would be a breach of contract theory which Broadway-Valentine never did plead. Rather, it pleaded a theory of recovery based upon its claim of contractual indemnity. No proof was elicited that the bank, through its contractor, Tom Martin Company, performed the work of installation of the 48 inch corrugated pipe in an unworkmanlike manner. There was, however, some evidence that the corrugated pipe was installed in a negligent manner, but Broadway-Valentine never did plead that it as an alleged tort-feasor was entitled to contribution on a comparative fault basis under *Missouri Pacific Railroad Company v. Whitehead & Kales Company*, 566 S.W.2d 466 (Mo. banc 1978). Under the circumstances of the record, the trial court did not err in directing a verdict for Broadway National Bank against Broadway-Valentine on its cross-claim for contractual indemnity.

█ Plaintiff says that the trial court erred in not submitting her requested Instruction Z, on the issue of punitive damages. Where the pleadings and evidence so warrant, the issue of punitive damages should be submitted to the jury, *Hallmark v. Stillings*, 648 S.W.2d 230, 237 (Mo.App. 1983), but the evidence must show that the act claimed to have given rise to recovery of punitive damages must be one *intentionally* done without just cause or excuse. *Stark v. American Bakeries Co.*, 647 S.W.2d 119 (Mo. banc 1983). The wrongful act or conduct must be accompanied by aggravating circumstances, so that the wrongdoer must know that when he commits the act that it is wrongful, or that there must be such recklessness that conscious wrongdoing is necessarily implied. See *Sledge v. Town & Country Tire Centers, Inc.*, 654 S.W.2d 176, 182 (Mo.App. 1983). In this case, however, there is no evidence that Broadway-Valentine neglected its parking lot intentionally, or with recklessness. All that the evidence shows is ordinary negligence. The trial court did not err in refusing to give Instruction Z.

The order granting Broadway-Valentine a new trial is reversed, and the case is remanded with directions to reinstate the verdict for plaintiff. In all other respects, the judgment is affirmed.

All concur.