HOOVER'S DAIRY, INC., Respondent,

v.

MID–AMERICA DAIRYMEN,
INC./SPECIAL PRODUCTS,
INC., Appellant,

and

DEC International, Inc., Appellant.

No. 66468.

Supreme Court of Missouri,
En Banc.

Nov. 21, 1985.

Joseph A. Sherman, Jack T. Bangert, Sam L. Colville and John F. Murphy, Kansas City, for appellant.

Max W. Foust, Steven D. Steinhilber and James P. Frickleton, Kansas City, for respondent.

WELLIVER, Judge.

Respondent, Hoover's Dairy, Inc., brought this action against appellants, Dairy Equipment International Inc. and Mid-America Dairymen, Inc./Special Products, Inc., to recover for the negligent installation of a milking system which respondent purchased from one of the appellants. Judgment was entered upon a jury verdict in favor of respondent. The court of appeals affirmed the judgment conditioned upon a remittitur. This Court ordered transfer, and we decide the case as if on original appeal. Mo. Const. art. V, § 10. We affirm in part and reverse in part.

I

Respondent Hoover's Dairy, Inc. is owned and operated by the Hoover family. For many years, the family has maintained a dairy farm in Cedar County. In 1977, they were milking approximately 130 cows. The dairy farm had a machine that would milk four cows at a time, and the milk would pass through glass lines. These glass lines—referred to as a high line system—were positioned above the cows. Respondent decided to purchase a more modern system that would milk ten cows at a time. The newer systems use steel lines and are low line systems, with the lines positioned below the cow.

Appellant Mid-America Dairymen, Inc. (hereinafter referred to as "Mid-Am") is an organization that sells automatic milking systems. Appellant Mid-Am is a milk marketing co-operative owned by over 11,000 dairymen in thirteen states and organized to market milk produced by member dairies. Through one of its wholly owned subsidiaries, SPI, it sells equipment used by dairymen.[1] SPI, only months before being contacted by respondent, contracted with appellant Dairy Equipment International, Inc. (DEC) to act as a distributor for DEC's automatic milking system. DEC manufactures the system under the trade name of Bou-Matic. The relevant portions of the contract between Mid-Am and DEC provided that Mid-Am would maintain an adequate number of competent trained servicemen necessary to provide reasonably prompt and efficient service, that Mid-Am would make available to its servicemen equipment to do a system analysis, that Mid-Am would conduct a systems analysis before and shortly after the installation of a Bou-Matic milking system and, immediately after the installation of Bou-Matic vacuum pumps, detachers, pulsators and claw assemblies and record the results of such analysis on forms furnished by DEC. DEC agreed to make available a DEC employee for assisting in initial sales solicitation. The contract also provided:

> Special Products shall employ at least one individual whose full time responsibility shall be to promote and sell DECO products to dairymen throughout the territory. This employee shall receive training in DECO sales and service procedures and attend DECO's training schools as reasonably required to maintain his knowledge of DECO's products.

The testimony at trial suggests that Mr. Hoover was predisposed toward purchasing appellant DEC's equipment because of Mr. Hoover's prior experience. Mr. Hoover testified that, while operating his farm, he had worked for Producers Creamery for twenty years, which later became Mid-Am. He then went into a partnership operating a farm supply store which sold farm equipment, including the Bou-Matic line. Some-

---

1. The parties have stipulated that for the purpose of this lawsuit, Mid-Am and SPI can be treated as the same entity.

time after the farm supply store was sold, he went to work for DEC for a couple of years until he took another job. Mr. Hoover contacted someone about changing milking systems and he was told that SPI had taken on the Bou-Matic line as a dealership.

Hoover was then contacted by Chuck Armstrong, the area zone manager for DEC, and by David Schlemeyer, a salesman for Mid-Am. Schlemeyer only recently had been hired by Mid-Am to act as the salesman in Southwest Missouri for the Bou-Matic system. Schlemeyer lacked experience in selling or installing milking systems, but had attended a training session conducted by DEC. After their first visit with respondent, Armstrong and Schlemeyer prepared a sketch of how the system could be installed in respondent's milking barn. In subsequent visits to the Hoover farm, Armstrong and Schlemeyer were accompanied on at least one occasion by Mark Heins, the regional sales manager for DEC. Although the parties disagree over the substance of some of the conversations with Mr. Hoover, either Heins or Armstrong told Mr. Hoover that Mid-Am would install the system but that DEC had confidence in Mid-Am. The discussions among Hoover, Armstrong, Schlemeyer and Heins resulted in respondent signing a purchase agreement on May 7, 1978. The total price of $9,706.51 included an $800 charge for installation. The purchase agreement was between appellant Mid-Am and respondent.[2]

Together, representatives from Mid-Am and DEC drafted a final blueprint for installing the milking system. The installation began on May 15, 1978. Along with Armstrong, present on the first day of installation was Mid-Am's crew: Schlemeyer and two other employees, Bill Thomas and Al Worthington. Neither Thomas nor Worthington had any prior experience in the installation of Bou-Matic milking systems. Armstrong claims that Schlemeyer was in charge of the installation, while Schlemeyer claims that Armstrong was in charge. On the second day, Armstrong testified that while he wanted to remain on the job he had to leave the farm at 2:30 in order to attend a meeting for DEC in Wisconsin. He did not return to the job. The installation was completed on the 18th, and respondent began milking cows on the new system that evening. Schlemeyer performed a decto recording upon the completion of the installation, which checked the vacuum level of the milking system. Two weeks later he went back to the farm and performed other tests but did not do a complete systems analysis. Schlemeyer testified that a system analysis was finally performed in June or July of 1978, but he never filled out the actual system analysis check form. However, the system analysis that he performed did not include a test for "stray voltage."

Only recently has it become generally known within the industry that there is a potential problem with stray voltage when installing a milking system. Stray voltage may exist independent of any error in installation and wiring in the system itself. Current may be present in the milking barn because of poor wiring in the barn, or the current may be a product of other equipment on the farm that makes its way into the barn through any grounded neutral system. This is wholly separate from voltage created by the milking system: rather, the system merely acts as a conduit through which pre-existing stray voltage may pass to the dairy cow, which may in turn cause the cow to receive an electrical shock. The consequences of such electrical shocks is that the cows become nervous during milking time and may not give all their milk. If milk remains in a cow's udder, it may lead to a bacterial infection called mastitis.

Armstrong testified that, after installation of a milking system, a system analysis is required which would, among other

2. While the agreement was a purchase order not signed by appellant Mid-Am, the parties have treated the agreement as a contract.

things, test for stray voltage. In January 1977, the president of DEC sent a memo to all dealers; accompanying the memo was one of the pioneer articles on the effects of stray voltage on dairy cows. This same article was then included in DEC's service manual. It might be noted, however, that at the time of this installation neither the Bou-Matic Instruction Manual, Exhibit No. 52, nor the Bou-Matic System Analysis Check Sheet, Exhibit No. 123, referred to a check for stray voltage. The new instruction manual and check sheet that became effective December 1, 1978 expressly provided for a stray voltage test (Exhibits 49–c, 49–j). There was testimony suggesting that on the old system analysis form the results of the test were supposed to be recorded under the "Recommendations" section.

Several weeks after the installation, milking time increased and the cows became nervous upon entering the barn. There was an increase in an infection of mastitis. Mastitis producing organisms are present on every dairy farm, but on respondent's farm only about 1% of the herd was affected prior to installation of the Bou-Matic system. Ten months after the installation, about 40% of the herd was infected. Respondent contacted its veterinarian who was unable to curb the problem and respondent sought assistance elsewhere but without success.

In March 1979, Mr. Hoover read an article about stray voltage in one of the trade journals, and the article indicated the possible connection between stray voltage and mastitis. He purchased a voltmeter, tested for stray voltage between the steel lines and the grate where the cows stood and obtained a positive reading. He then bonded the system together in order to eliminate the stray voltage. Respondent finally brought the problem with mastitis under control, but only after losing seventy-six cows to slaughter.

Respondent commenced this action against both appellant DEC and appellant Mid-Am, alleging strict liability, negligence and express or implied warranty. It also seeks punitive damages. Before any evidence was heard, respondent informed the court that it would only submit the case on the theory of negligence. Appellant Mid-Am cross-claimed against appellant, DEC, and appellant DEC cross-claimed against appellant Mid-Am. The jury found for respondent and awarded $234,443.00 in actual damages and $1,000,000.00 in punitive damages. Fault was assessed as 40% against appellant Mid-Am and 60% against appellant DEC. The jury found against each appellant on the cross-claims. No appeal was taken from the jury's verdict on the cross-claims.

## II

We note at the outset that there is no allegation that the system or installation itself was defective. Instead, respondent submitted its case against each appellant on a negligence theory. In its brief and in oral argument, respondent argued that appellant Mid-Am accepted responsibility for installing the milking system and that by failing to test for stray voltage appellant was negligent in the installation. In oral argument and in its brief, respondent avers, *inter alia*, that appellant DEC is liable for having given respondent "assurances that it would see that the installation was done correctly and competently and that it would participate in the installation."[3] Respondent also contends that DEC is liable for having undertaken the responsibility of training and supervising Mid-Am employees and then not exercising reasonable care in that supervision and training. Only this latter theory was submitted to the jury and may be considered. Verdict director instruction No. 8 against appellant DEC provides:

Your verdict must be for plaintiff against defendant DEC International, Inc. if you believe:

First, defendant DEC International, Inc. undertook to train and supervise

---

**3.** This claim might have been important to establish liability under a warranty or representation theory, but it has no bearing on the theory as submitted to the jury.

Mid-America Dairymen, Inc./Special Products, Inc. in the proper installation of the system, and

Second, defendant DEC International, Inc. permitted installation of the system without a test for stray voltage, and

Third, defendant DEC International, Inc. was thereby negligent, and

Fourth, such negligence either directly caused damage to plaintiff or combined with the acts of defendant Mid-America Dairymen, Inc./Special Products, Inc. to directly cause damage to plaintiff.

Instruction No. 7 against appellant Mid-Am provides:

Your verdict must be for plaintiff against defendant Mid-America Dairymen, Inc./Special Products, Inc. if you believe:

First, defendant Mid-America, Inc./Special Products, Inc. failed to test for a stray voltage, and

Second, defendant Mid-America Dairymen, Inc./Special Products, Inc. was thereby negligent, and

Third, such negligence either directly caused damage to plaintiff or combined with the acts of defendant DEC International, Inc. to directly cause damage to plaintiff.

Appellants do not challenge the submission of this case on a cause of action in tort for negligence. They argue that the verdict directing instructions were deficient because the instructions did not submit knowledge as an element of actionable negligence. Appellant DEC further alleges that the use of the word "undertook" in instruction no. 8 was misleading and prejudicial. Appellants also argue that respondent failed to prove any proximate cause between the alleged negligence and the resulting injury, that the issue of punitive damages should not have been submitted to the jury, that inflamatory statements were made during closing argument and that there should have been remittitur on the actual damages.

■ A claimant in a negligence action must establish a (1) legal duty on the part of the defendant to conform to a certain standard of conduct to protect others against unreasonable risks; (2) a breach of that duty; (3) a proximate cause between the conduct and the resulting injury; and (4) actual damages to the claimant's person or property. W. Prosser & W. Keeton, Prosser and Keeton On Torts § 30 (1984). *E.g., Virginia D. v. Medesco Inv. Corp.,* 648 S.W.2d 881, 886 (Mo. banc 1983). "[T]he duty to exercise care may be a duty imposed by common law under the circumstances of a given case." *Zuber v. Clarkson Construction Co.,* 251 S.W.2d 52, 55 (Mo.1952). *See generally* 57 Am.Jur.2d *Negligence* §§ 36–53 (1971). "Where the existence of a duty is established, however, it is not one to protect against every possible injury which might occur." *Irby v. St. Louis County Cab Co.,* 560 S.W.2d 392, 394 (Mo.App.1977). Rather, it is generally measured by "whether or not a reasonably prudent person would have anticipated danger and provided against it." *Scheibel v. Hillis,* 531 S.W.2d 285, 288 (Mo. banc 1976). *See also Smith v. Archbishop of St. Louis,* 632 S.W.2d 516, 521 (Mo.App.1982).

■ The initial question is whether knowledge is an essential part of every negligence action. It is generally stated that foreseeability that some injury might result from the act complained of normally serves as the paramount factor in determining the existence of a duty. *See e.g., Lowrey v. Horvath,* 689 S.W.2d 625, 627 (Mo. banc 1985); *Joyce v. Nash,* 630 S.W.2d 219, 222–23 (Mo.App.1982). When deciding if some injury was reasonably foreseeable, whether expressly or implicitly, courts examine what the actor knew or should have known. *See generally Robertson v. LeMaster,* 301 S.E.2d 563 (W.Va.1983) (for a good discussion of the concept of "duty"). *See also Otis Engineering Corp. v. Clark,* 668 S.W.2d 307 (Tex.1983).

[T]he duty of a person to use care and his liability for negligence depend upon the tendency of his acts under the circumstances as they are known or should be known to him. The foundation of liability for negligence is knowledge—or

what is deemed in law to be the same thing: opportunity by the exercise of reasonable diligence to acquire knowledge—of the peril which subsequently results in injury.

57 Am.Jur.2d *Negligence* § 54 (1971). Quite often, therefore, knowledge is an element that must be included in a negligence instruction in order to impose the existence of the claimed duty.[4] In some cases, however, the duty itself is said to arise out of a relationship between the parties:

> When the existence of a duty to use due care rests on a relationship between persons, the law has simply placed the actor under obligation for the benefit of another person—the plaintiff—in the given circumstances. Or, more simply, the law has determined that "the interest of the plaintiff which has suffered invasion [is] entitled to legal protection at the hands of the defendant." Prosser, The Law of Torts § 37, p. 206 and § 53 (4th ed. 1971).

Thus, essential to liability for negligence is a relationship the law recognizes as the basis of a duty of care between the inflictor of injury and the person injured. *Zuber v. Clarkson Construction Co.*, 363 Mo. 352, 251 S.W.2d 52, 55 [6, 7] (Mo.1952). The judicial determination of the existence of a duty rests on sound public policy as derived from a calculus of factors: among them, the social consensus that the interest is worthy of protection; the foreseeability of harm and the degree of certainty that the protected person suffered injury; moral blame society attaches to the conduct; the prevention of future harm; consideration of cost and ability to spread the risk of loss; the economic burden upon the actor and the community—the others. 1 Dooley, Modern Tort Law, Liability & Litigation § 3.03 (Supp.1981); *Thompson v. County of Alameda*, 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728, 732 [7–9] (bank 1980); *Donohue v. Copiague U. Free School District*, 64 A.D.2d 29, 407 N.Y.S.2d 874, 877 [3, 4] (1978).

*Hyde v. City of Columbia*, 637 S.W.2d 251, 257 (Mo.App.1982), *cert. denied, Tribune Pub. Co. v. Hyde*, 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983). Actual or constructive knowledge in these situations may not be necessary to establish the duty.

▆ In the case at bar, the duty each appellant owed to respondent arose out of a relationship created by appellants' conduct and not from any actual or constructive knowledge. The agreement between appellant Mid-Am and respondent served as the "inducement creating the state of things which furnishes the occasion of the tort." 57 Am.Jur.2d Negligence § 47 (1971). Appellant Mid-Am was induced to undertake the installation of the milking system which it sold to respondent. Once it undertook to render services, appellant Mid-Am was obligated to exercise reasonable care in performing the service. "The law imposes an obligation upon everyone who attempts to do anything, even gratuitously, for another, to exercise some degree of care and skill in the performance of what he has undertaken." 57 Am.Jur.2d *Negligence* § 45 (1971). *See also* W. Prosser & W. Keeton, *supra*, at §§ 56, 92–93. The Restatement (Second) of Torts § 323, relied upon by respondent, provides:[5]

render services to another which he or she should recognize as necessary for the protection of a third person. The principle of the law set forth in this section is relied upon to establish the same type of liability against appellant DEC. Appellant DEC has not argued that it should be treated differently than the manner in which the law treats professionals. *Cf. Westerhold v. Carroll*, 419 S.W.2d 73 (Mo.1967). Nor has either appellant argued that the principle of law espoused in § 323 and § 324A only applies when the negligence results in bodily harm.

---

4. *See e.g., Fowler v. Park Corp.*, 673 S.W.2d 749, 753 (Mo. banc 1984); *Reed v. Hercules Const. Co.*, 693 S.W.2d 280, 282 (Mo.App.1985); *Asher v. Broadway-Valentine Center, Inc.*, 691 S.W.2d 478, 483 (Mo.App.1985); *Ridenhour v. Colson Caster Corp.*, 687 S.W.2d 938, 946 (Mo.App. 1985); *Hanten v. Jacobs*, 684 S.W.2d 433, 435 (Mo.App.1984); *St. John Bank & Trust Co. v. City of St. John*, 679 S.W.2d 399, 402–03 (Mo. App.1984); *Joyce v. Nash*, 630 S.W.2d 219, 222–23 (Mo.App.1982).

5. Restatement (Second) of Torts § 324A imposes a similar duty on a party who undertakes to

**§ 323. Negligent Performance of Undertaking to Render Services**

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

Therefore, if one renders services for the benefit of another, courts will impose a duty to exercise care apart from the defendant's actual or constructive knowledge. *See e.g., Stanturf v. Sipes,* 447 S.W.2d 558, 561 (Mo.1969); *Wolfmeyer v. Otis Elevator, Co.,* 262 S.W.2d 18 (Mo.1953); *Berry v. Emery, Bird, Thayer Dry Goods Co.,* 357 Mo. 808, 211 S.W.2d 35 (1948); *Schubiner v. Oppenheimer Industries, Inc.,* 675 S.W.2d 63, 76–77 (Mo.App.1984); *Brown v. Michigan Millers Mut. Ins. Co. Inc.,* 665 S.W.2d 630 (Mo.App.1983); *Volume Services, Inc. v. C.F. Murphy & Associates, Inc.,* 656 S.W.2d 785 (Mo.App.1983); *Howell v. Welders Products & Services, Inc.,* 627 S.W.2d 311 (Mo.App.1981). *See also Cheek v. Williams-McWilliams Co., Inc.,* 697 F.2d 649, 656 (5th Cir.1983); *General Dynamics Corp. v. SELB Manuf.,* 481 F.2d 1204, 1216 (8th Cir.1973) (applying Missouri law), *cert. denied,* 414 U.S. 1162, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974); *Circle Land & Cattle Corp. v. Amoco Oil Co.,* 232 Kan. 482, 657 P.2d 532 (1983). Actual or constructive knowledge in these cases, however, may become important in defining the scope of the standard of care owed.

■ Thus, under the unique facts and circumstances of this case the element of knowledge was not necessary to create appellants' duty to exercise reasonable care when installing, and in supervising the installation of, the milking system. The determinative factual question was whether appellants exercised reasonable care in the installation and supervision thereof. While some evidence suggests that it was not then the standard of the industry to conduct tests for stray voltage, appellant DEC apparently was one of the leaders in the field and conceded along with Dr. Rollins for Mid-Am that a test for stray voltage should have been conducted. Appellant DEC does not dispute that it failed to stay on the job and supervise the completion of the installation, including the systems analysis. It is of no consequence that DEC might have thought that the test had been performed. It was a jury question whether reasonable care required that appellant DEC remain on the job and whether the test should have been conducted. No error occurred by omitting an element of knowledge in the two verdict directing instructions.

### III

■ This Court has examined appellant DEC's additional challenge to instruction no. 8, and we do not find that the use of the word "undertook" was ambiguous or prejudicial given the facts of this case. A necessary predicate for establishing liability against appellant DEC was that DEC *undertook* to train appellant Mid-Am employees and supervise installation of the milking system. The record is undisputed that appellant DEC did just that.

### IV

Next, both appellants claim that there was insufficient evidence to establish that the failure to test for stray voltage resulted in injury to respondent. Appellants present four arguments. First, they allege that no evidence shows that stray voltage was present in the milking barn on the date of installation. Second, even if stray voltage was present, they claim a lack of any evidence establishing that the voltage would have been detected by a voltmeter test. Third, they aver that even if stray voltage was present and detectable, no evidence establishes that the voltage reached the dairy cows. And fourth, even assuming detectable stray voltage that reached the cows, appellants argue that respondent

failed to prove that the harm to the dairy herd was caused by the stray voltage.

■ It is well-established that when considering whether a plaintiff presented sufficient proof we must view the evidence in the light most favorable to plaintiff, give the plaintiff the benefit of all favorable inferences and disregard defendant's evidence unless it is favorable to plaintiff. *See Hannah v. Mallinckrodt, Inc.*, 633 S.W.2d 723, 724 (Mo. banc 1982). "Determination of substantiality and proximity of the causal relationship between negligence and injury is dependent upon the particular facts of each case and it is seldom that one decision controls another." *Metzger v. Schermesser*, 687 S.W.2d 671, 673 (Mo.App. 1985). Proof of proximate cause may be established from either direct or circumstantial evidence. *See Curtis v. Fruin-Colnon Constructing Co.*, 363 Mo. 676, 253 S.W.2d 158, 161 (1952); *Messing v. Judge & Dolph Drug Co.*, 322 Mo. 901, 18 S.W.2d 408 (Mo.1929); *Harris v. Washington*, 654 S.W.2d 303, 306 (Mo.App.1983).

■ Respondent presented substantial evidence that had the stray voltage been detected immediately after the installation then the injury to the herd would not have occurred. The court of appeals correctly observed that, anomalously, appellants' argument that respondent failed to produce direct evidence of stray voltage on the date of installation is the consequence of the very omission upon which liability turns—the failure to conduct a test for stray voltage. Respondent, therefore, was required to establish the fact, if possible, through circumstantial evidence. Respondent and one of respondent's expert witnesses at trial testified that they had conducted a test with a voltmeter when the source of the stray voltage was not grounded and they detected stray voltage of up to 2.8 volts. These tests measured the voltage between the steel lines and the grate where the cows stood.[6] Under these circumstances, this is evidence from which the jury could infer that stray voltage was present and detectable during the installation of the milking system. Evidence derived from subsequent examinations *may* help establish a preceding condition. *See e.g., Breeding v. Dodson Trailer Repair*, 679 S.W.2d 281, 287 (Mo. banc 1984).

■ Other facts were introduced from which the jury could conclude that stray voltage was present and caused the increase in mastitis. A number of expert witnesses and numerous publications indicated that stray voltage could cause mastitis in dairy cows, a fact virtually undisputed at trial.[7] The symptoms commonly observed as incidents to stray voltage were observed on respondent's dairy farm within weeks after the installation. Additionally, there was a dramatic increase in mastitis shortly after the installation and there was a amelioration of the problem after eliminating the stray voltage. The issue, therefore, was properly a jury question.

## V

■ Appellant Mid-Am also argues that the trial court erred in not ordering a new trial after certain allegedly inflammatory statements were made by respondent's counsel during closing argument. Determining the prejudicial effect of final argument is a matter within the discretion of the trial court, and the trial court's judgment on that matter will not be disturbed unless there was an abuse of discretion.

6. Appellants allege that while stray voltage may have been present between the steel lines and the grate there was no evidence that the current reached the cows through the part of the system connected to the teat of the cow. The circumstantial evidence was sufficient to allow the jury to infer that the current passed to the cows.

7. Appellants have presented this Court with an article that appeared after the trial that suggests that the amount of current that allegedly passed to respondent's dairy cows was not perceptible to cows and could not have caused the mastitis. Most of the information on stray voltage has been obtained since the installation of respondent's milking system. A reading of the literature suggests that it is still a disputed point on the extent of voltage necessary to effect a cow. This was an issue subject to argument before the jury and is not changed by the publication of one article.

*See Handshy v. Nolte Petroleum Co.*, 421 S.W.2d 198, 202 (Mo.1967); *Pfeffer v. Kerr*, 693 S.W.2d 296 (Mo.App.1985). This Court has examined the issue and finds no abuse of discretion.

## VI

Both appellants also have presented challenges to the award of punitive damages. Instruction no. 10 allowed the jury to award punitive damages against each appellant if the jury found that the conduct submitted under the separate verdict directors, instructions no. 7 and 8, "showed complete indifference to or conscious disregard for the consequences to others." Respondent submitted this instruction as a modification of MAI 10.02, which provides in relevant part that the jury may award punitive damages if it believes that the conduct in the verdict director instruction "showed complete indifference to or conscious disregard for the *safety of* others" (emphasis added). Respondent substituted "consequences to others" for "safety of others," a material alteration allowing recovery absent any threat to the "safety" of others—that is, to personal injury. Appellants argue that this substitution was prejudicially erroneous. They also claim that because instructions no. 7 and 8 did not include any knowledge requirement such a requirement had to be included in the punitive damage instruction. Appellants present the additional claim that no evidence warranted a submission of punitive damages.

This Court has recognized that in a case where liability is established by negligence the negligent conduct may further rise to the level of reckless so as to warrant punitive damages. In *Sharp v. Robberson*, 495 S.W.2d 394 (Mo. banc 1973), this Court held that under the proper circumstances punitive damages could be awarded where liability was based upon negligence. There, the Court quoted and approved the following language from a previous opinion:

> Ordinarily such damages are not recoverable in actions for negligence, because/ negligence, a mere omission of the duty

to exercise care, is the antithesis of willful or intentional conduct. *Raming v. Railroad*, 157 Mo. 477, 57 S.W. 268; *Bindbeutal v. Railway*, 43 Mo.App. 463. But an act or omission, though properly characterized as negligent, may manifest such reckless indifference to the rights of others that the law will imply that an injury resulting from it was intentionally inflicted. *McNamara v. Transit Co.*, 182 Mo. 676, 81 S.W. 880, 66 L.R.A. 486; *Railroad v. Arms*, [1 Otto 489,] 91 U.S. 489, 23 L.Ed. 374. *Or there may be conscious negligence tantamount to intentional wrongdoing, as where the person doing the act or failing to act must be conscious of his conduct, and, though having no specific intent to injure, must be conscious, from his knowledge of surrounding circumstances and existing conditions, that his conduct will naturally or probably result in injury. Louisville, etc., Railroad Co. v. Anchors*, 114 Ala. 492, 22 So. 279, 61 Am.St.Rep. 116.

*Sharp v. Robberson, supra,* at 397 (quoting *Reel v. Consolidated Inv. Co.*, 236 S.W. 43 (Mo.1921)). This Court recognized that when punitive damages are based upon such complete indifference or conscious disregard, then

> failure to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other, but also involves a high degree of probability that substantial harm will result to him.

*Sharp v. Robberson, supra,* at 398 (quoting *Nichols v. Bresnahan*, 212 S.W.2d 570, 573 (1948)).

 The principle expressed in *Reel* and reaffirmed in *Sharp* parallels that found in The Restatement (Second) of Torts, § 500. The comments to § 500 makes it clear that the actor must either know or have reason to know that his or her act is substantially likely to cause physical harm. Perhaps the classic example is of an individual firing a rifle into a moving passenger train. There,

the actor either knows or has reason to know that there is an unreasonable risk that a passenger will be hit. *See generally* W. Prosser & W. Keeton, *supra,* at 9–10, 212–14.

∎ Decisions subsequent to *Sharp* have made it clear that punitive damages can be awarded in a negligence action but only when the defendant knew or had reason to know that there was a *high degree of probability* that the action would *result in injury. See e.g., Jordan v. General Growth Dev. Corp.,* 675 S.W.2d 901, 905 (Mo.App.1984); *Smith v. Sayles,* 637 S.W.2d 714, 719 (Mo.App.1982); *Joyce v. Nash,* 630 S.W.2d 219, 224 (Mo.App.1982); *Smith v. Courter,* 575 S.W.2d 199, 207 (Mo.App.1978); *Stenson v. Laclede Gas Co.,* 553 S.W.2d 309, 315 (Mo.App.1977). Poor workmanship that does not pose an *immediate* danger to the safety of others does not justify awarding punitive damages. *See Jordan v. General Growth Dev. Corp., supra,* at 906. In *Stenson v. Laclede Gas Co.,* for example, the defendant was negligent in failing to fill in an excavation, but the court held that punitive damages could not be awarded because there was no evidence that the defendant knew or had reason to know that the excavation was not properly filled and then did nothing about it. *Stenson v. Laclede Gas Co., supra,* at 316. In *Sledge v. Town & Country Tire Centers, Inc.,* 654 S.W.2d 176 (Mo. App.1983), the plaintiff brought a personal injury action premised upon the defendant's failure to lubricate properly the rear axle bearings of the automobile in which the plaintiff was riding. The court held that punitive damages were improper because there was no evidence that defendant knew his act was wrongful and would probably result in injury. The court observed that "[h]is actual or constructive knowledge that injury could occur if he was negligent was an element of defendant's duty. It does not supply the knowing violation of that duty necessary to support punitive damages." *Sledge v. Town & Country Tire Centers, Inc., supra,* at 182.

∎ Assuming, without deciding, that the modification to the instruction was proper under the law, punitive damages in the present case could be awarded only if the jury could have found that (1) DEC knew or had reason to know that leaving the job before the installation was completed posed an unreasonable risk with a high probability that a substantial injury would occur; and that (2) Mid-Am knew or had reason to know that by failing to test for stray voltage it was creating an unreasonable risk that substantial injury was highly probable. There is no evidence in the record that could even suggest that either of the appellants knew or had reason to know that their claimed negligent acts posed an unreasonable risk that was highly probable to result in substantial injury to respondent. Nothing indicates that they knew or had reason to know that stray voltage was in the barn and that by failing to conduct the test and alleviate the problem, or by failing to remain on the job and supervise, that the stray voltage would ultimately create an unreasonable risk involving a high degree of probability that substantial harm would result. The analogy can be drawn to a mechanic who fails to test the brakes on a car. Assuming that the examination should have been conducted, the mechanic is negligent but not liable for punitive damages unless it can be shown that he or she knew or had reason to know that the brakes were faulty and thus a substantial likelihood existed that the brakes would fail and result in great bodily harm. Such is the critical difference between negligence in order to establish liability and reckless conduct which would justify a punitive damage award.

∎ In strict liability cases, for example, MAI 10.04 requires that the defendant must (a) know of the dangerous condition, and (b) thereby show complete indifference to or conscious disregard for the safety of others. The difference between MAI 10.02 and MAI 10.04 is the additional element of knowledge required in the latter. The reason for including knowledge directly in the punitive damage instruction for strict liability is that knowledge is not

submitted as an element to establish liability. It is important to note that in such cases actual knowledge of the dangerous condition is generally required. *See e.g., Love v. Deere & Company,* 684 S.W.2d 70, 77 (Mo.App.1985); *Sparks v. Consolidated Aluminum Co.,* 679 S.W.2d 348, 354 (Mo. App.1984); *Racer v. Utterman,* 629 S.W.2d 387, 396–97 (Mo.App.1981). Actual knowledge of the dangerous condition, just as knowledge of the faulty brakes in the above example, furnishes the element of reckless conduct justifying a punitive damage award.

■ Respondent seeks to justify the punitive damage award because appellant Mid-Am knew its installation crew was inexperienced and because appellant DEC knew that the crew was inexperienced and failed to remain on the job until completion. This is not the necessary type of knowledge that amounts to reckless conduct expressed in *Sharp* and embodied in MAI 10.02. Whether or not DEC knew that the crew was inexperienced when it left the job, and whether or not Mid-Am knew its crew was inexperienced and in need of supervision by DEC might otherwise have served as an independent basis for claiming *negligence* but not *recklessness.* Rather, those issues comprise much of the evidence at trial and relate solely to the fight between DEC and Mid-Am over their respective cross-claims.

Having decided that there was no evidence justifying the submission of a punitive damage instruction, we need not address appellant's claimed instructional errors.[8]

### VII

■ On their last assignment of error, appellants argue that the trial court should have entered a remittitur on the actual damages. It might be noted that only appellant DEC properly preserved this issue in its post trial motion. In *Firestone v. Crown Center Redevelopment Corp.,* 693 S.W.2d 99 (Mo. banc 1985), this Court abolished the doctrine of remittitur. There was no trial error. The argument on damages was made to the jury and then by DEC to the trial court and was rejected.

Judgment for actual damages is affirmed and judgment for punitive damages is reversed.

HIGGINS, C.J., and MAUS, Special Judge, concur.

DONNELLY, J., concurs in separate opinion filed.

BILLINGS and BLACKMAR, JJ., concur in part and dissent in part in separate opinions filed.

RENDLEN, J., concurs in separate opinion of BILLINGS, J., concurring in part and dissenting in part.

ROBERTSON, J., not participating because not a member of Court when cause was submitted.

DONNELLY, Judge, concurring.

I suspect that the Court violates Article I, § 10 of the Constitution of Missouri when, *in any event,* it allows punitive damages and thereby "circumvent[s] due process by delegating punitive functions to private litigants and civil courts." Grass, The Penal Dimensions of Punitive Damages, 12 Hastings Const. L.Q. 241 (1985). *See also* Wheeler, The Constitutional Case

---

8. Ordinarily in a negligence action the jury, when deciding whether to award punitive damages, has already been instructed that they must find that the defendant knew or should have known certain facts in order to create a duty to exercise reasonable care. This actual or constructive knowledge on the part of the defendant is assessed by the jury to determine whether it was knowledge of such a degree that the defendant knew or had reason to know that his or her conduct created an unreasonable risk out of which it was highly probable that substantial harm would result. This is the difference between foreseeability in negligence and reckless conduct for punitive damages. Because the duty to exercise reasonable care in this case arose independent from appellants' actual or constructive knowledge, appellants allege that the jury was not properly instructed on the degree of actual or constructive knowledge necessary for awarding punitive damages.

for Reforming Punitive Damages, 69 Va.L. Rev. 269 (1983).

I concur.

BILLINGS, Judge, concurring in part and dissenting in part.

I concur in the principal opinion except as to that part that declares as a matter of law that the evidence was insufficient to submit a punitive damage instruction and reversing the award of punitive damages. In my view, there was substantial evidence from which the fact finder could conclude that the negligent conduct of the defendants rose to the level of *reckless indifference.*

I would affirm the judgment.

BLACKMAR, Judge, concurring in part and dissenting in part.

I concur, except as to Part VII. I believe that the award of actual damages is not supported by the evidence to the extent of $92,212. The Court of Appeals correctly analyzed the problem, as the following portions of Judge Clark's opinion demonstrate:

Hoover's proof of actual damages sustained and the verdict which awarded Hoover the full amount claimed are challenged on grounds of duplication and uncertainty of proof in particular categories. Appellants' points have merit and necessitate reduction of the actual damage award to the extent of $92,212.00.

The primary issue in the computation of damages commences with an item of undisputed loss, the value of dairy cows rendered unproductive by mastitis and sold for slaughter. Taking into account the potential of these animals for future production of milk and calves, the value of 76 cows was calculated at $117,641.00. Proceeds from the slaughter of these animals amounted to $46,497.00 leaving a net loss of $70,479.00. Appellants do not contest this computation and proof. Hoover also claimed, however, a loss of $48,981.00 on the same cows, being the value of their milk production for the next succeeding lactation period of 305 days. Also claimed was $13,300.00 attributable to production of calves. Appellants contend the amounts of $48,981.00 and $13,300.00 were included in the valuation of the animals and should not be repeated in the damage computation.

From the evidence presented on the subject, it is apparent the value of each of the dairy cows sold for processing as meat was individually computed taking into account the animal's milk production record and the value of prospective calves. Those animals with higher production potential were valued at a greater amount than those which had shown lower production ability. Necessarily, a replacement animal acquired at the value price, assuming comparable stock, would provide the purchaser with the future milk and calf production on which the animal's price was based.

In *Snyder v. Bio-Lab, Inc.,* 94 Misc.2d 816, 405 N.Y.S.2d 596 (N.Y.Sup.Ct.1978), the damages recoverable for loss of milking cows was examined. The court observed:

"As with personal property generally, the measure of damages for injury to, or destruction of, an animal is the amount which will compensate the owner for the loss and thus return him, monetarily, to the status he was in before the loss. * * * For example, when an owner has received the market value of an animal, he will have been compensated for any use he might have made of the animal for breeding purposes. * * * Also, the loss of produce of an animal is an item of consideration in determining market value, rather than a separate item of damages." *Snyder v. Bio-Lab* at pp. 597–598.

Here, compensation to Hoover for the value of the 76 cows under a method which took into account the productive worth of the animals as dairy cows restores plaintiff to the position which obtained before the loss. The award of damages based on future milk and calf production from the same animals is a

duplication of that value and cannot be sustained.

\* \* \* \* \* \*

[The court held that the plaintiff was entitled to recover losses occasioned because comparable replacements were not immediately available and younger, less productive animals had to be used].

\* \* \* \* \* \*

Hoover also claimed as damages the amount of $11,862.00 incurred as added labor expense attributable to increased work load and milking time. Appellants assert that one-half of this amount was unsupported by the evidence. There was, in fact, little evidence to sustain this claim, no proof of extra help employed and no other detail confirmatory of the claim. Appellants challenge to allowance of one-half of the amount, $5,931.00, is sustained, that being the extent of the point as presented.

Finally, as to damages not proven, appellants contend there was no basis upon which to award plaintiff $24,000.00 claimed as interest expense incurred because payment was not made on a farm debt. The exception to this item is well taken.

The ostensible basis for allowing the interest charge as an element of damage originated with the retention by Hoover of 40 heifers, as explained above, to fill the complement of his dairy herd when 76 mature cows were unavailable to be purchased. According to plaintiff, had it not been for the loss of the 76 cows in the original herd, these 40 heifers would have been sold generating cash to reduce a mortgage obligation and avoid interest payments on that debt.

Tenuous as this analysis may be, the claim was not includable as an item of damage recoverable by Hoover Dairy, Inc. because there was no proof as to the mortgage, the balance owed, the interest paid and, of primary importance, no evidence that the corporation as distinguished from the Hoover family members was obligated on the mortgage note. In short, plaintiff did not prove it had actually sustained the loss.

There is legal error in the monetary award. It makes no difference that only one of the defendants properly preserved the claim of error. The defendants were sued jointly, and the error was properly pointed out to the trial court. Because of the legal error, the verdict of $234,443 for actual damages cannot stand.

Because there is legal error, the Court should explore the means of correction. The Court of Appeals used the remittitur device, obliging the plaintiff to remit the portion of the damages not supported by the evidence or suffer a new trial. The principal opinion now holds that his method of correction is not available, by reason of *Firestone v. Crown Center Redevelopment Corp.*, 693 S.W.2d 99 (Mo. banc 1985).[1] *Firestone* dealt with remittitur, at the trial level, of a portion of an unliquidated award for personal injuries. The holding certainly was not intended to have the effect attributed to it in the principal opinion—that of abolishing the legal rules developed over the years as to measure of damages, thereby leaving the damage award entirely to the jury. When damage is to property and business, furthermore, the courts have traditionally demanded a more precise calculation than is required in personal injury cases.

The actual damages claimed were set out by the plaintiff in discrete items. The jury awarded everything the plaintiff asked. Under these circumstances, I would simply reduce the judgment to the maximum figure supported by evidence by excluding the duplicative or improperly included items. ($142,231.00 as computed by the Court of

---

1. I was obliged to recuse in *Firestone.* I do not agree with the abolition of remittitur, as decreed in that case. It was not necessary to decide the point to rule the case at hand, because the majority found that the plaintiff was entitled to reinstatement of her verdict in her appeal under Rule 78.10, and so the abolition of remittitur is essentially an exercise of the rule-making power, rather than the decision of a particular case. The holding operates to deprive courts of a traditional and useful device for saving the expense of retrial.

Appeals.) There is no reason to burden the courts and the parties with a new trial on the amount of damages, when it can be said as a matter of law that legally improper items were included in the verdict.[2]

I agree that the portion of the judgment asserting punitive damages must be reversed. I would also reverse the award of actual damages and would remand with directions to enter judgment for the plaintiff in the amount of $142,231. If the majority is of the opinion that this reduction would constitute a prohibited remittitur, the remand should be for a new trial on the issue of actual damages only.

---

**2.** The case would be more difficult if the jury had not awarded the entire amount claimed, because it could not be determined whether the legally erroneous items had been included in the verdict. The judgment, then, could not be reduced without the plaintiff's consent. I believe that the plaintiff should have the option of consenting to a reduction sufficient to exclude the error as a factor, rather than suffering a new trial. *Cf. Hart-Bartlett-Sturtevant Grain Co. v. Aetna Insurance Co.*, 293 S.W.2d 913 (Mo. 1956). *Firestone* did not deal with a problem of this kind and it should not be mechanically applied in situations which the Court which decided that case did not have any occasion to consider.